MICHIGAN HUMANE SOCIETY v NATURAL RESOURCES
COMMISSION

Docket No. 87939. Submitted October 22, 1986, at Lansing. Decided
March 3, 1987.

On July 12, 1985, the Natural Resources Commission voted to
establish a season for hunting mourning doves, and the Depart-
ment of Natural Resources subsequently issued hunting regula-
tions establishing a twenty-two-day open hunting season begin-
ning September 15, 1985, and ending October 6, 1985. On
August 2, 1985, the Michigan Humane Society filed suit against
the Natural Resources Commission and the Department of
Natural Resources in Ingham Circuit Court challenging defen-
dants' authority to establish a mourning dove hunting season.
The court, James T. Kallman, J., found that the NRC was
without concurrent or exclusive authority to establish a mourn-
ing dove hunting season and that plaintiff and the Michigan
residents plaintiff represented would suffer an irreparable in-
jury if the mourning dove hunt were allowed. Plaintiff's motion
for summary disposition was granted and a permanent injunc-
tion enjoining defendants from holding, administering, oversee-
ing or promoting an open hunting season on mourning doves
was entered. Defendants appealed.

The Court of Appeals *held*:

A recent statutory amendment reclassifying mourning doves
as game birds does not authorize the NRC to establish an open
hunting season on mourning doves. The statute leaves the
power to declare an open hunting season with the Legislature
and allows the NRC to establish the time, manner, and bag
limits of a hunt should the Legislature declare such an open
season.

Affirmed.

GAME — MOURNING DOVES — NATURAL RESOURCES COMMISSION —
HUNTING SEASON.

The classification of mourning doves as game birds in the Hunt-

REFERENCES

Am Jur 2d, Fish and Game §§ 29 *et seq.*
See the annotations in the Index to Annotations under Fish and
Game.

ing and Fishing License Act does not authorize the Natural Resources Commission to establish an open hunting season on mourning doves (MCL 316.105(3)(e); MSA 13.1350[105][3][e]).

*Sienna LaRene,* and *Vanderkloot & Haynes, P.C.* (by *Jeffrey K. Haynes*), for plaintiff.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Thomas J. Emery* and *Kevin T. Smith,* Assistant Attorneys General, for defendants.

Before: SULLIVAN, P.J., and SHEPHERD and R. M. SHUSTER,* JJ.

SHEPHERD, J. Defendants appeal from the September 25, 1985, opinion and order of the circuit court in this dispute over the authority of defendants to establish a hunting season for mourning doves, *Zenaidura macroura carolinensis.* The circuit court granted plaintiff's motion for summary disposition under MCR 2.116(C)(10) and denied defendants' motion for summary disposition under MCR 2.116(C)(8). The circuit court also granted plaintiff's request for a permanent injunction restraining defendants from holding, administering, overseeing or promoting an open hunting season on mourning doves. We affirm since we hold that the Legislature did not delegate authority to defendants to establish such a season.

Mourning doves are members of the family Columbidae. They are classified as migratory game birds and are subject to extensive federal regulation, 16 USC 703 *et seq.* See generally 50 CFR 20. States may adopt their own hunting regulations for migratory game birds provided they are at least as restrictive as the federal standards. 16 USC 708. Federal regulations change annually

---

* Circuit judge, sitting on the Court of Appeals by assignment.

based upon an annual state-by-state breeding census. In turn, annual changes in state regulations are required. Thirty-five states have apparently authorized the hunting of mourning doves.

On July 12, 1985, defendant Natural Resources Commission voted to establish a season for hunting mourning doves and defendant Department of Natural Resources subsequently issued hunting regulations. The regulations established a twenty-two day open hunting season beginning September 15, 1985, and ending October 6, 1985. The NRC established bag and possession limits and specified areas where hunting would be allowed. It also established regulations concerning the manner of hunting.

On August 2, 1985, plaintiff filed this action to challenge defendants' authority to establish a mourning dove hunting season. Count I alleged that the NRC acted in excess of its delegated authority by establishing an open season, and Count II argued that, if defendants had authority to establish a hunt, such delegation of authority was an unconstitutional grant of legislative authority to an administrative agency. On August 20, 1985, the circuit court granted plaintiff's preliminary injunction request to enjoin the proposed hunt.

Plaintiff subsequently moved for summary disposition under MCR 2.116(C)(10) on August 27, 1985. A hearing was held on September 5, 1985. The parties agreed that no factual dispute existed. At the summary disposition hearing, and on appeal, the parties conceded that the proposed hunt would have no biological impact on the mourning dove population. Likewise, the absence of a hunting season would have no biological impact on the population, which is annually reduced by at least seventy percent through natural causes.

The circuit court entered its opinion and order

on September 25, 1985. The court concluded that the NRC was without concurrent or exclusive authority to establish a mourning dove hunting season. The court found no indication in the relevant statutes that the Legislature intended to confer such authority on the NRC. The court found that plaintiff and the Michigan residents plaintiff represented would suffer an irreparable injury if the mourning dove hunt were allowed. Accordingly, the court granted plaintiff's motion for summary disposition and entered a permanent injunction.

Defendants' main premise is that a recent statutory amendment reclassifying mourning doves as game birds authorized the NRC to establish an open season. Because this case requires extensive statutory interpretation and determination of legislative intent, a discussion of the relevant statutory framework is necessary.

Const 1963, art 4, § 52 requires the Legislature to provide for the protection of the state's natural resources from "pollution, impairment and destruction." Although the Convention Comment to this constitutional provision indicates that it is a new section, the Legislature earlier created the predecessors of the DNR and NRC through 1921 PA 17; MCL 299.1(1), (2); MSA 13.1(1),(2). Through the enactment of 1925 PA 230, specifically MCL 300.1; MSA 13.1211, the Legislature authorized the Conservation Commission, and subsequently the NRC, to regulate the taking or killing of all game birds protected by the laws of this state and to suspend or abridge the open seasons provided by law, if necessary:

> The commission of conservation of the department of conservation of this state shall, in accordance with the provisions of this act, have power to regulate the taking or killing of all fish, game

and fur-bearing animals and game birds protected by the laws of this state, and may suspend or abridge the open season provided by law for the taking or killing of any such fish, animals or game birds in any designated waters or area of this state, whenever in the opinion of said commission of conservation it becomes necessary to assist in the increased or better protection of such fish, game or fur-bearing animals or game birds, or of any particular kinds or species of the same, which may in the opinion of said commission be threatened from any cause or causes with depletion or extermination in said waters or area, and for the purpose of such regulation, suspension, or abridgement, said commission of conservation is hereby empowered to make and promulgate any and all orders and regulations necessary to carry out the provisions of this act and as in this act provided, on the recommendation of the director of conservation after a thorough investigation has been made by him.

The Game Law of 1929, 1929 PA 286; MCL 311.1 *et seq.;* MSA 13.1321 *et seq.,* (game law) contains numerous provisions pertinent to our discussion. It has been repeatedly amended since its enactment. Chapter I contains definitions, including that of "non-game birds," "game" and "open season." Until amendment by 1982 PA 335, Chapter I also provided a definition of "game birds." This definition, however, did not include birds in the family Columbidae, such as mourning doves.

Chapter II of the game law consists of general hunting and possession regulations. It also includes a provision establishing open hunting seasons for specific birds and animals, MCL 312.11; MSA 13.1340. These open seasons vary considerably. While specific dates are established for some animals, the act provides that skunks, for example, may be taken at any time under rules promul-

gated by the NRC. The Legislature also provided that certain animals, such as moose, killdeer, and eagles, to name but a few, shall not be killed at any time. While the section does not provide that mourning doves may not be killed at any time, neither is an open season specifically established for mourning doves, nor does it appear that the Legislature has ever established such a season. Chapter IV of the game law covered licenses and permits, but much of it was repealed by the Hunting and Fishing License Act, 1980 PA 86, MCL 316.101 *et seq.;* MSA 13.1350(101) *et seq.* (license act).

The license act contains the following definitions:

> (1) "Game" includes game birds and game animals.
>
>             *    *    *
>
> (3) "Game birds" includes all of the following:
>
> (a) The anseriformes, commonly known as geese, brant, and wild ducks.
>
> (b) The gruiformes, commonly known as rails, coots, and gallinules.
>
> (c) The charadriformes, commonly known as shore birds, snipe, woodcock, plovers, and sandpipers.
>
> (d) The galliformes, commonly known as pheasant, quail, Hungarian partridge, grouse, prairie chicken, sharptailed grouse, and wild turkey.
>
> (e) *The columbiformes, commonly known as doves and pigeons.*
>
> (f) The corvidae, commonly known as crows, ravens, and jays. [MCL 316.105; MSA 13.1350(105). Emphasis added.]

Unlike the definition of game birds in the game law, the definition in the license act includes columbiformes and corvidae. Thus, prior to the en-

actment of 1982 PA 335, two separate definitions
of game birds existed in the game laws. The defini-
tion in the game law did not include doves, but the
definition in the license act did. The definition of
game birds in the game law was repealed by 1982
PA 335, as was the definition of "game animal,"
"small game," and "fur-bearing animals." The
license act's definition of game is quite similar to
that remaining in the game law, MCL 311.7; MSA
13.1327.

The NRC argues that these statutes and amend-
ments provide concurrent authority to establish
open seasons, at least for animals such as mourn-
ing doves for which the Legislature has not al-
ready established an open season. The fundamen-
tal legal issue presented in this appeal, then, is
whether the challenged administrative order cre-
ated new law or merely constituted a discretionary
exercise of the NRC's authority.

Both plaintiff and defendants have cited *Coff-
man v State Board of Optometry Examiners,* 331
Mich 582, 590; 50 NW2d 322 (1951), for the test to
determine the scope of authority delegated to an
administrative agency:

> In 42 Am Jur, § 26, p 316 *et seq.,* it is stated:
> "Administrative boards, commissions, and offi-
> cers have no common-law powers. Their powers
> are limited by the statutes creating them to those
> conferred expressly or by necessary or fair implica-
> tion. . . . In determining whether a board or com-
> mission has a certain power, the authority given
> should be liberally construed in light of the pur-
> poses for which it was created and that which is
> incidentally necessary to a full exposition of the
> legislative intent should be upheld as being ger-
> mane to the law. . . Implication of necessary pow-
> ers may be especially appropriate in the field of
> internal administration. However, powers should

not be extended by implication beyond what may be necessary for their just and reasonable execution."

Unlike the case at bar, *Coffman* involved an explicit delegation of authority to the State Board of Optometry Examiners which the Court found to be an unconstitutional grant of authority. *Id.* at 588-590. In contrast, no explicit grant of authority is involved in this case. Instead the parties argue whether the Legislature implicitly delegated authority to defendants to establish an open season for the hunting of mourning doves.

In deciding this question, we are guided by the Supreme Court's words in *People v Soule,* 238 Mich 130, 139; 213 NW 195 (1927), in which the Court described the authority of the Conservation Commission, the NRC's predecessor, after the commission had made it unlawful to take fish from particular protected lakes:

The commission in promulgating administrative orders within defined legislative limits to carry out the expressed will of the legislature makes no new law. It but exercises a discretion on ascertained conditions under and in pursuance of the law. Punishment for violation of its properly promulgated orders is fixed by the legislature. Where the statute provides a punishment for violating the regulations or orders of a commission, the power to create a crime is not delegated to the commission. . . .

What the commission was authorized to do under section 3 of the act is to determine the existence of facts and conditions there clearly outlined, and, pursuant to such determination, promulgate its orders. In the leading case of *Locke's Appeal,* 72 Pa St 491 [13 Am Rep 716 (1873)], it is said on this subject:

"The legislature cannot delegate its power to

make a law; but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend. To deny this would be to stop the wheels of government." [Citation omitted.]

The answer to the question presented in this appeal ultimately depends on the effect of the 1980 and 1982 amendments to the game laws. As in any statutory interpretation problem, the cardinal rule requires us to ascertain and give effect to the Legislature's intent. When determining legislative intent, statutory language should be given a reasonable construction considering the statute's purpose and the object sought to be accomplished. An act must be read in its entirety and the meaning given to one section arrived at after due consideration of other sections so as to produce, if possible, a harmonious and consistent enactment as a whole. Statutes are to be construed so as to avoid absurd consequences. *King v Midland Co Dep't of Social Services Director,* 73 Mich App 253, 258-259; 251 NW2d 270 (1977). Statutes which relate to the same person or thing, or the same class of persons or things, or which have a common purpose are considered *in pari materia.* In construing a particular statute, or in interpreting its provisions, all statutes relating to the same subject, or having the same general purpose, should be read together as constituting one law, although enacted at different times and containing no reference to one another. Each must be given effect if such can be done without repugnancy, absurdity, or unreasonableness. *State Bar of Michigan v Galloway,* 124 Mich 271, 277; 335 NW2d 475 (1983), aff'd 422 Mich 188; 369 NW2d 839 (1985).

Defendants contend that the Legislature gave the NRC the general power to regulate the taking

or killing of all game birds by 1925 PA 230, specifically MCL 300.1; MSA 13.1211, which in part gives the NRC power "to regulate the taking or killing of all fish, game and fur-bearing animals and game birds protected by the laws of this state." Defendants further point to MCL 312.10(4); MSA 13.1339(4), which provides in part:

> The commission *may promulgate rules governing the taking, and the manner of taking,* of migratory game birds, wild turkeys, and crows and establishing areas and quotas for taking wild turkeys. [Emphasis added.]

Based on these statutes, defendants infer that "the Legislature has established a scheme of concurrent jurisdiction over hunting where the NRC has the authority to adopt regulations subject to preemption by legislative action, but granting the NRC final word on seasons if necessary to protect a particular species. While the Legislature has chosen in many areas to exercise its authority, the specific grant of authority to govern the taking and manner of taking of migratory birds indicates that the Legislature has not intended to preempt all NRC discretion." Defendants recite several instances in which the NRC has exercised its discretion to fill gaps left by the Legislature, either by defining the time limits of a hunting season or by defining the bag limits.

We are not persuaded by defendants' concept of concurrent jurisdiction. We do not read MCL 300.1; MSA 13.1211 so broadly as to find a delegation of general power to establish open hunting seasons. Instead, we view the statute as leaving the power to declare an open hunting season with the Legislature and allowing the NRC to establish the time, manner, and bag limits of a hunt pursu-

ant to the Legislature's decision to declare such an open season. The statute also allows the NRC to "suspend or abridge the open season provided by law" for the various species. While this provision does not foreclose the possibility of open seasons provided not by law but rather by NRC rule, we take a different view and conclude that this language provides further evidence of the Legislature's control over declaring open seasons. Had the Legislature intended to give the NRC authority to establish open seasons, it could easily have done so at some time during the long history of the various game laws. The apparent limitation of the NRC's control over open seasons to those "provided by law," that is, by the Legislature, suggests the omission of further authority was intentional.

No different interpretation is required by MCL 312.10(4); MSA 13.1339(4). Defendants make much of the fact that this statutory provision refers to regulation of both "the taking and the manner of taking of migratory game birds," arguing that taking must thus mean something more than the manner of taking, implicitly suggesting the power to establish open seasons. We disagree. As defendants have noted, regulations on taking can concern such important details as bag limits, which in no way relate to the manner in which game birds are taken. The authority to place limits on the number of animals taken is not the same as the authority to permit the taking in the first place. Moreover, this subsection is contained within a lengthy section prohibiting and regulating various hunting methods and practices, making it an unlikely source of such an important power as the power to establish hunting seasons. MCL 312.10; MSA 13.1339 thus contains no suggestion that the Legislature has delegated authority for the NRC to create a mourning dove open season, an interpre-

tation borne out by the history of amendments to the statute.

Defendants next urge this Court to apply the statutory construction rule of reading statutes *in pari materia* to the original definition of game birds in the game law, MCL 311.5; MSA 13.1325, the new definition of game birds contained in the license act, MCL 316.105(3); MSA 13.1350(105)(3), and to section 2(b) of 1982 PA 335, which repealed the original definition of game birds in the game law. According to defendants, after the enactment of 1982 PA 335, (1) mourning doves were considered "game birds," (2) no statute prevented the hunting of mourning doves, and (3) the Legislature took no steps to protect mourning doves from an open season. Defendants conclude that the only possible legislative intent that can be inferred from all this is that the Legislature intended to allow the NRC discretion to authorize a season.

We are not convinced that the Legislature's action reveals a clear intent to allow an open hunting season against mourning doves. When the new definition of game birds was enacted in the license act, no change was made in the definition of game birds in the game law. The game law plainly determines what animals and birds may be hunted, while the license act is strictly concerned with licensing those who hunt game animals and game birds within seasonal time limits created by law. The two definitions of game birds existed for approximately two years before 1982 PA 335 was enacted. Thus, the mere fact that mourning doves are designated game birds in the license act does not imply a delegation of authority for the NRC to establish an open season. Again, all that the license act does is to regulate hunting and fishing within seasons created by the Legislature.

We decline to read the statutes *in pari materia*

since we do not discern a sufficiently common purpose. Although the game law and the license act both regulate hunting in this state, their purposes are very different. The game law represents a legislative policy decision that hunting of certain animals should be permitted. In contrast, the license act represents the Legislature's policy decision on how and at what cost that hunting should occur. In these statutes, the Legislature has not addressed the policy issue of whether mourning doves should be hunted. Instead, it appears to have decided that an individual could be licensed to hunt mourning doves, should the Legislature later declare an open season.

Other portions of the game law and license act reinforce our interpretation. The license act definition of open season, MCL 316.107(1); MSA 13.1350(107)(1), provides:

> "Open season" means the time during which game animals, game birds, fur-bearing animals, and fish may be legally taken or killed, and includes both the first and last day of the season or period.

In contrast, the definition of open season in the game law, MCL 311.9; MSA 13.1329, contains a significant difference:

> The term "open season" shall mean the time during which game animals, game birds, or fur-bearing animals may be legally taken or killed, and shall include both the first and last day of the season or period *designated by this act.* [Emphasis added.]

The emphasized language of the statute implies that an open season can only be that time period established by legislation, rather than administrative rule.

We believe that the Legislature's jealous guard-
ing of its power to declare open hunting seasons is
best shown in MCL 312.11; MSA 13.1340 and the
numerous amendments to that section since it was
first enacted. This statute creates numerous open
seasons. Defendants argue that the section is not
exclusive, as it states that "[e]xcept as otherwise
provided in this act, a person shall not take . . .
*any of the following animals or birds* at any time
other than the open seasons established in this
act" (Emphasis added.) The NRC interprets this as
providing no limitation on its authority to estab-
lish seasons with regard to birds not enumerated
in this section. The NRC's authority is not limitless,
however, but is instead limited by the statutes
creating the NRC. *Coffman, supra.* Defendants fail
to identify any source of the implied authority
they insist is left untouched by MCL 312.11; MSA
13.1340 beyond those sources already discussed
and rejected above. The extensive control exercised
by the Legislature through the years convinces us
that such implied authority does not exist.

Defendants note that in 1929 and 1930, the
NRC's predecessor declared an open season on wo-
odcock at a time when no such season was estab-
lished by the game law in MCL 312.11; MSA
13.1340. We decline to view this unauthorized act
as confirming the NRC's plenary power to create
open seasons for all game birds and game animals,
however. In 1931, the Legislature amended the
statute to expressly create an open season on
woodcock, negating, we believe, any inference of
an implied delegation of authority and reaffirming
the Legislature's control over open seasons.

We also note that the consistent construction
given to a statute by an executive department
charged with its administration will be given great
weight by the courts if the meaning of the statute

is in doubt. *Wyandotte Savings Bank v State Banking Comm'r,* 347 Mich 33, 48; 78 NW2d 612 (1956); *Roosevelt Oil Co v Secretary of State,* 339 Mich 679, 693-694; 64 NW2d 582 (1954). Plaintiff provided the trial court with numerous documents demonstrating a belief by defendants' officials that legislative action was necessary to establish a mourning dove season. This belief was repeatedly expressed in correspondence between the officials of the DNR and citizens, as well as in correspondence related to surveys conducted by the conservation departments of other states. It was apparently not until an opinion memorandum prepared by counsel for the Michigan United Conservation Clubs was circulated to NRC members in May, 1985, that the NRC concluded it had been delegated authority to establish a dove season. The earlier contrary administrative interpretation, which we find more persuasive, existed well after the 1980 and 1982 legislation that allegedly delegated the authority.

We necessarily return to Const 1963, art 4, § 52, requiring the Legislature to protect the state's natural resources, including mourning doves. This requirement is best effectuated by finding no legislative delegation of authority to defendants given the statutory history of the game law and license act and the language of those statutes. As it is apparent that the Legislature has kept control of the power to declare open seasons, it seems clear that the Legislature has deliberately avoided an express grant of authority to the NRC. We consequently cannot accept defendants' arguments in favor of implied authority, which require strained construction of statutory language and an unwarranted reliance on legislative inaction. In light of the constitutional mandate to the Legislature, this matter is too important to rest on the assumption

that the NRC has implied authority to establish a mourning dove season simply because no laws expressly forbid such a season. Our finding of no delegation makes it unnecessary to consider the constitutionality of such a delegation. We also see no need to comment on arguments relating the desirability (or lack thereof) of an open season for the hunting of mourning doves. That is a legislative question and those who would desire a hunting season for mourning doves can address their concerns to the Legislature.

Affirmed.