ROOSEVELT OIL COMPANY *v.* SECRETARY OF STATE.

1. TAXATION—GASOLINE—PURPOSE OF ACT.
   The purpose of the gasoline tax act is to prescribe a privilege tax for the use of the public highways by owners and drivers of motor vehicles by imposing a specific tax upon the sale or use within the State of gasoline (CL 1948, § 207.101 *et seq.*).

2. SAME—WHOLESALE DISTRIBUTORS.
   Wholesale distributors of gasoline are primarily accountable as collectors of the tax imposed under the gasoline tax act (CL 1948, §§ 207.108, 207.108a).

3. SAME—WHOLESALE DISTRIBUTORS—REFINERS—BLENDING.
   That a distinction was to be drawn between an ordinary wholesale distributor of gasoline and refiners thereof was intended by the legislature in the gasoline tax act is evidenced by the provision excepting "such blending as may occur in the process known as refining by the original refiner of crude petroleum" from definition of blending of petroleum products subject to tax (CL 1948, § 207.101).

4. SAME—GASOLINE—ALLOWANCE FOR EVAPORATION AND LOSS.
   The 3% allowance for evaporation and loss of gasoline under the gasoline tax act is not applicable as regulating allowance for

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 51 Am Jur, Taxation § 1261.
  Construction of gasoline tax statutes. 111 ALR 185.
[2] 51 Am Jur, Taxation § 1272.
[8] 50 Am Jur, Statutes § 325.
[9] 50 Am Jur, Statutes § 228.
[10] 14 Am Jur, Costs § 91.

losses sustained by a refinery, a refinery's losses being regulated only by the economic necessity for maximum operational efficiency (CL 1948, § 207.108).

5. SAME—UNACCOUNTED FOR GASOLINE.

Unaccounted for gasoline of refinery, representing difference between total of production of refined gasoline and purchased gasoline on the one hand and total of gasoline sold by refinery as a wholesale distributor or to wholesale distributors was not taxable under the gasoline tax act, where it has not been proved that such quantity constituted a wilful diversion of production as an attempted means of avoiding the tax (CL 1948, § 207.101 *et seq.*).

6. SAME—GASOLINE—DELIVERY SHORTAGES.

The gasoline tax act does not require that a tax be levied upon receipts of purchased gasoline as indicated by refinery's books as having been received because of shortages in delivery effected by deliverymen (CL 1948, § 207.101 *et seq.*).

7. SAME—GASOLINE—SALES—STORAGE.

The statutory gasoline tax applies only to those taxable products which are actually sold or which have been stored for the purpose of later sale (CL 1948, § 207.101 *et seq.*).

8. STATUTES—PRACTICAL CONSTRUCTION.

The practical construction given to obscure statutes by administrative officers will be given weight by the court in construing such a statute and such a construction will not be overturned unless clearly wrong or unless a different construction is plainly required.

9. SAME—CONSTRUCTION.

It is the function of a court to fairly interpret a statute as it then exists, not to legislate.

10. COSTS—PUBLIC QUESTION—CONSTRUCTION OF STATUTE.

No costs are allowed in suit involving the construction of a tax statute, a public question being involved (CL 1948, § 207.101 *et seq.*).

Appeal from Ingham; O'Neill (James E.), J., presiding. Submitted January 7, 1954. (Docket No. 26, Calendar No. 45,456.) Decided June 7, 1954.

Bill by Roosevelt Oil Company and Roosevelt Oil & Refining Corporation, Delaware corporations,

against Frederick M. Alger, Jr., as Secretary of State, and Harold E. Bradshaw, as director of gasoline tax division, Michigan Department of State, to determine liability for gasoline tax and restrain collection of alleged arrears. Decree for plaintiffs. Defendants appeal. Affirmed.

*Stern, Milmet & Rossier,* for plaintiffs.

*Frank G. Millard,* Attorney General, *Edmund E. Shepherd,* Solicitor General, and *Ernest O. Zirkalos,* Assistant Attorney General, for defendants.

Butzel, C. J. Plaintiff Roosevelt Oil & Refining Corporation is a successor in interest to coplaintiff Roosevelt Oil Company through merger. Both were active during the first 7 months of 1948, the taxable period in question. They are joined as plaintiffs without objection on the part of the appellants. For convenience we shall refer to them as a single entity, herein designated as the appellee or the refinery.

Appellee has operated a large oil refinery at Mt. Pleasant, Michigan, since 1930. Among the products produced from crude petroleum are gasoline, naphtha, kerosene and the various grades of fuel oils. In addition to refining crude petroleum, the refinery also further processes unfinished or partially-refined gasoline purchased from other refineries for the purpose of producing a salable product. The designation of this purchased and unfinished or partially-refined gasoline as "gasoline" constitutes one of the points of controversy in the case, as claimed by appellants. Small quantities of high-quality gasoline, some of which are purchased, are mixed and blended with the refined fluid to form the finished, salable product.

For the past 18 years the refinery has filed monthly reports on the forms furnished by the gasoline tax

division of the secretary of State's office. These reports have been audited, examined and duly approved by the gasoline tax division as being in full compliance with the gasoline tax act, PA 1927, No 150, as amended (CL 1948, § 207.101 *et seq.* [Stat Ann 1950 Rev § 7.291 *et seq.*]) referred to herein as the gasoline tax act. It is undisputed that up to the period in question the tax division's theory of tax liability was based upon sales and shipments from the refinery. A letter dated September 23, 1948, from the director of the gasoline tax division informed the refinery that an audit of the refinery's operations for the period January 1, 1948, to July 31, 1948, disclosed a tax liability of $64,273.59 (without the addition of interest and penalties). Conferences between representatives of the refinery and the tax division followed. Subsequently the refinery employed Ernst & Ernst, a firm of accountants, to review the asserted basis of liability. Since no agreement as to the liability could be reached and the tax division threatened to proceed with its claim, the refinery filed a bill of complaint in the circuit court for the county of Ingham seeking a review of the matter pursuant to the statute (CL 1948, § 207.116 [Stat Ann 1950 Rev § 7.306]).

The defendants are Frederick M. Alger, Jr., secretary of State of the State of Michigan, and his successor, Owen J. Cleary, and Harold E. Bradshaw, director of the gasoline tax division of the State of Michigan. For brevity, we shall refer to them as appellants.

The trial judge ruled that the gasoline tax was imposed on gasoline sold or stored for purposes of sale and that under the tax division's theory of liability the examination or audit conducted by the accountants employed by the refinery was proper and correct, notwithstanding the tax division's audit. He, therefore, permanently enjoined the tax division of

the secretary of State's office from collecting any amounts claimed as owing by the appellee under the gasoline tax act for the period January 1, 1948, to July 31, 1948.

The basic operation of the refinery may be briefly described as follows: Crude petroleum is heated to approximately 650 degrees Fahrenheit and split into various components in a fractionating tower or crude tower; the overhead from that tower constitutes a gasoline-kerosene mixture which is taken through condensers and receivers to a surge-storage tank, designated as tank 11, where the purchased unfinished gasoline may also be received for further refining; the contents of tank 11 constitute the feed to the second stage wherein the material is heated to 700 to 1050 degrees Fahrenheit, passed through catalytic chambers, and fed into a fractionating tower designated as tower No 1; during 6 of the 7 months in question, prior to the installation of a stabilizer unit, the overhead from tower No 1 was temporarily stored in 2 tanks and was ultimately piped into 1 of the 4 tanks called finishing tanks and numbered 6, 7, 8 and 41; the bottom product from tower No 1 constitutes the feed to the third stage of the refinery, called the "naphtha unit," which consists of 5 fractionating towers arranged in series, the bottom product from the preceding tower constituting the charge to the next; the "naphtha unit" may be adapted to produce either gasoline or any one of the naphthas depending upon the market conditions and orders of the company; the overhead product of these towers is piped to the finishing tanks or the naphtha tanks depending upon the product being produced at the time; mechanical agitation takes place in the finishing tanks for the purpose of homogeneously blending tetraethyl lead or other additives with the gasoline produced in the refinery; the gasoline produced after blending is

piped from the finishing tanks to the loading rack, or temporarily stored in 3 small tanks, to allow for production fluctuations, pending distribution. The total production charged to the refinery during the period January 1, 1948, to July 31, 1948, was 27,645, 201 gallons.

In April, 1948, investigations instituted by appellee and conducted by the State police in cooperation with a private investigator employed by the refinery disclosed that large quantities of gasoline were being stolen. These thefts occurred essentially in 2 ways: (1) deliberate overloading of trucks leaving the refinery with the connivance of some dishonest refinery employees, and (2) short deliveries, the refinery actually receiving less gasoline than the purchase invoices disclosed. These thefts were called to the attention of the tax division by the appellee and apparently were at least one of the motivating reasons for the institution of a new theory of gasoline tax liability for refineries under the gasoline tax act.

Prior to the present action, the refinery paid its gasoline tax as computed on forms furnished by the tax division. This monthly form reported 3 basic items of information: (1) withdrawals for distribution, (2) sales upon which taxes were collected, and (3) sales to other licensed distributors from whom the tax would be collected, the sum of the last 2 items constituting the first. Accompanying this tax form a schedule, designated as C-2, was submitted. This schedule required detailed information which included the following: Beginning inventory, production and purchases as the gallonage to be accounted for; and ending inventory, transfers to other products, and losses as deductions which, with the sum of withdrawals, balanced the schedule. For 5 of the 7 months in question the refinery set forth large losses on this schedule as a balancing item to

reconcile the gallonage to be accounted for with the total deductions and withdrawals. It is claimed by appellee that the C-2 schedule accompanying the tax form was submitted for statistical and cross-checking purposes only and was not used in computing the tax. That such information was not used in computing the tax is evident since under the then basis of liability, approved by the appellants, the tax could be computed solely from withdrawal records.

Appellants claim that the prior administration of the gasoline tax act was due to an erroneous interpretation of that act. The tax division, acting upon the advice of an assistant attorney general assigned to that division, began the audit or internal control examination which resulted in the claim for the alleged tax liability herein involved. This asserted liability is based upon a new interpretation of the statute, it being claimed that under the statute a refinery is liable for all gasoline from the moment it is produced within the refinery or designated as such within the refinery, and not merely for withdrawals from the refinery as shown by the sales invoices.

The basic issues in the case, briefly stated, are these: (1) Does the gasoline tax act impose tax liability on a refinery for gasoline prior to its withdrawal from the refinery for purposes of use, sale, or storage for sale? (2) If the refinery must account for gasoline within the refinery, at which point in the refining process must it begin to account for the gasoline? (3) What is the proper allowance for loss that may be taken by a refinery? The answers to these issues must be found in the gasoline tax act, *supra,* as it existed during the period in question.

The purpose of the Michigan gasoline tax act, as set forth in the title to the act, is to "prescribe a privilege tax for the use of the public highways by owners and drivers of motor vehicles by imposing a specific

tax upon the sale or use within the State of Michigan, of gasoline." Section 2 of the act imposes the tax upon 2 items: (1) gasoline sold, and (2) gasoline used in producing or generating power for propelling motor vehicles used upon the public roads and highways of this State. Section 2 imposes the tax upon the ultimate consumer but defers the manner of collecting the tax to latter sections of the act. Any purchaser of gasoline who uses it for any purpose other than the operation of a motor vehicle upon the roads and highways of the State is entitled to a refund of the tax paid in such purchase in accordance with section 12 of the act.

Section 7 of the act states that:

"It shall also be unlawful for any retail dealer to knowingly purchase gasoline for sale or use on the public highways of this State from any other than a licensed wholesale distributor."

Section 8a of the act imposes upon a wholesale distributor, who sells or distributes any gasoline for any purpose, the duty of collecting the tax from the purchaser and the duty of holding the tax money so collected in trust for the State. The State, therefore, holds the licensed wholesale distributors of the State primarily accountable as collectors of the tax. Section 8 of the act provides for the computation of the tax for which the State holds the wholesale distributor liable.

The pertinent portions of section 8 of the act state:

"And in case gasoline is not so received and such wholesale distributor manufactures or produces within this State the gasoline in his or its possession in said State, the report hereby required shall in lieu of the foregoing information set forth the following: All gasoline manufactured, stored, used, distributed, and sold within this State during the preceding calendar month, and date of each sale, use

or distribution. * * * Provided, however, That in computing said tax, a deduction of 3 per cent of the quantity of gasoline received shall be deducted to allow for evaporation and loss: And provided further, however, That in computing said tax all gasoline while in process of transfer from tank steamers at boat terminal transfers, as defined in this act, and while held in storage, pending wholesale bulk distribution by land transportation, or in tanks and equipment used in receiving and storing gasoline from interstate pipe lines pending wholesale bulk reshipment, shall be exempt from the payment of said tax. Gasoline refined at a refinery in this State or gasoline stored at a boat terminal transfer in this State may be sold, shipped or delivered to wholesale distributors who are holders of unrevoked wholesale distributors' licenses issued by the secretary of State as in this act provided, without liability on the part of the seller for the tax herein imposed but such purchasers shall be liable for the tax on such gasoline and shall for the purposes of this act be deemed to be the wholesale distributors of the gasoline so received."

It is the present position of the tax division that since the statute compels the refinery as a wholesale distributor to report all gasoline manufactured and received, the refinery must pay a tax on that gasoline unless it can properly account for such gasoline. The result of such an interpretation, according to appellee's contention, would be to impose a tax upon the loss in the *manufacture* or *production* of gasoline refined in this State under a statute which expressly taxes only the sale of gasoline or the use of gasoline for propelling motor vehicles upon the highways of the State. Manifestly, the tax division claims that even though the tax is upon the sale or use of gasoline, the legislature, by requiring that refineries in the State report all gasoline "manufactured," intended that such refineries pay a tax upon such pro-

duction and receipts unless properly accounted for; that the tax upon production and receipts not properly accounted for is a necessary means of properly enforcing the tax upon the sale or use of gasoline. The refinery further contends that the term "manufactured" as used in the statute is synonymous with "stored, distributed, or sold" since the refinery's record of gasoline manufactured is its record of distributions and sales; that, up to that point, the record is a computed figure of gasoline in the "process of manufacture" not intended to be included within the term "manufactured" as used in the statute.

The tax division contends, overlooking for the moment the inconsistent assertions of counsel, that production of gasoline is to be determined at the point in the refinery at which a taxable product is produced or at a point where a fluid is designated as gasoline. The refinery contends, if production is to be distinguished from sales and distributions, that production should be determined to be the gasoline received into the final finishing tanks 6, 7, 8 and 41. According to the tax division's theory of liability and theory of gasoline accountability, the refinery has not properly accounted for 2,101,099 gallons, a final figure agreed upon as being in dispute after previous adjustments. Under the tax division's theory of liability and the refinery's theory of accountability 543,889 gallons are not accounted for. It must be stated that the term "unaccounted for," or variants of that term, involve a legal conclusion but for brevity we shall refer to the disputed amounts by that term.

The appellants' figure is attacked by the appellee as being inaccurate. This figure is said to include (1) large losses incurred in the entire refining process, (2) many items of duplication, (3) various transfers, and (4) the gasoline stolen from the refinery. The appellee's figure, based upon the quantity re-

ceived in the finishing tanks, includes (1) refining losses occurring in the last process of refining, and (2) the quantity of gasoline stolen, the total figure constituting, essentially, the gallonage that "disappeared" between the point of entry into the finishing tanks and the point of sale. The refining process that takes place in the finishing tanks is basically a blending process.

Section 1 of the gasoline tax act states that the product of blending is to be included within the definition of gasoline "provided the resultant product so obtained is capable of use for the generation of power for the propulsion of motor vehicles, airplanes or motor boats." The section further provides:

"The term 'blending' means the mixing together by any process whatsoever, of any 1 or more products of petroleum, with or without other products, and regardless of the original character of the product so blended, provided the resultant product so obtained is capable of use for the generation of power for the propulsion of motor vehicles, airplanes, or motor boats, *except only such blending as may occur in the process known as refining by the original refiner of crude petroleum.*" (Emphasis added.)

It is evident that the legislature anticipated that there would be blending processes in the operation of a refinery and intended that the products of such blending be excluded from the definition of taxable gasoline under the statute. This section is evidence of the distinction drawn by the legislature between the ordinary wholesale distributor and a refinery as such within the statute.

Section 8 of the act, as quoted above, provides for an allowance for evaporation and loss of "3 per cent of the quantity of gasoline *received.*" The term "received" is an appropriate designation for the gasoline handled by the ordinary wholesale distributor who stores and distributes gasoline to retail dealers;

the term does not adequately describe the gasoline handled by a refinery. This would seem to indicate that the legislature did not intend to set up a flat statutory allowance for loss in refineries, but determined that losses in a refinery should be regulated only by the economic necessity for maximum operational efficiency. Furthermore, as pointed out by appellee, if the finishing tanks were considered as a division separate from the refinery and the gasoline received therein treated as gasoline "received" by the ordinary wholesale distributor the 3% allowance for evaporation and loss permitted by the statute would more than adequately cover the "unaccounted for" gasoline. The tax division is not prepared to allow this 3% since the greater portion of the refinery's production is sold to wholesale distributors who will presumably take the 3% allowance. But it seems obvious that refinery losses occur on gasoline production other than the gasoline sold in a taxable transaction upon which the refinery is permitted the 3% loss.

The problem before us may now be stated as this: If the refinery must account for the gasoline prior to its sale and distribution, then, appellants assert, it may be taxed upon the "unaccounted for" quantity since it cannot properly account for its disappearance; if the refinery need account only at the point of sale or distribution, then the "unaccounted for" quantity is not taxable since the tax division has not proved nor is there any indication that that quantity constituted a wilful diversion of production as an attempted means of avoiding the gasoline tax.

The record is barren of any evidence that the refinery sought to evade the payment of taxes. We must overlook the completely unsupported assertion of appellants' counsel during trial that reasons existed for the excessive losses and thefts to which the refinery was subjected. It seems clear that under

the tax division's and refinery's audits the "unaccounted for" gallonage is attributable to the serious theft losses resulting from the conspiracy between some dishonest refinery employees and outsiders and also to manufacturing or producing losses in a transitional operating period, and is not attributable to unrecorded withdrawals from the refinery as a means to avoid the payment of the gasoline tax.

During the period under consideration, the first 7 months of 1948, appellee's refinery was undergoing extensive alterations, and experimentations were being conducted in regard to its method of processing crude petroleum.   It was further shown that the meters at the sales distribution point were faulty and had to be repaired or removed.   New meters were on order but were not readily obtainable at the time. Testimony in the case indicated that the refinery had been operating above its designed capacity with a resultant decrease in operating efficiency.   A stabilizer unit was constructed in conjunction with tower No 1 in an attempt to cut down losses due to evaporation in that tower.   The type of tanks used in the refinery were not the type that insured maximum protection against evaporation losses.   These losses must be included in the appellants' "unaccounted for" figures since it is clear that the production figure of the appellants included the gallonage in tanks 11 and 15.   Tank 11 held the gasoline-kerosene mixture from the crude tower and at times received the partially refined gasoline stock purchased for further refining.   Tank 15 contained the bottom product from No 1 tower and at all times contained gasoline, kerosene, and polymers, this mixture constituting the charge to the naphtha unit for subsequent refining.   Regardless of the name or label given the fluid in these tanks, the testimony clearly shows that the tanks did not contain a salable product but only material that was transferred to a sub-

sequent unit of the refinery where losses did occur in the manufacture.

In an analysis of pump records and receipts, the appellants show that out of 1,654,818 gallons shown as received by purchase records the pump records disclose that only 1,224,105 gallons were actually received. The difference, 430,713 gallons, was never actually received by the refinery. This quantity apparently was stolen by the means of delivering less than a full load to the refinery, the driver of the transport truck then leaving the refinery with a portion of the purchased gallonage retained in the truck tanks. The appellants contend that even though the refinery never actually received this quantity of gasoline, it must, nevertheless, pay the tax on that amount since the gasoline was the property of the refinery and their records show that that amount was received. Because it is assumed that someone used that gasoline in generating power for the propulsion of a motor vehicle on the highways of the State, the appellants assert that the appellee is liable for the gasoline tax on that quantity. We do not believe that the statute should be construed to lead to such a result. We do not here say what the legislature may do as a means of enforcing the gasoline tax; it is sufficient to say that the statute before us, construed in its entirety, does not go that far.

During the trial and in the briefs on appeal, counsel for appellants repeatedly cited the case of *C. E. Austin, Inc.,* v. *Secretary of State,* 321 Mich 426 (cert denied 335 US 828 [69 S Ct 56, 93 L ed 382]). Briefly stated, that case, not a refinery case, held that when tax-exempt and tax-liable gasoline were knowingly commingled for the convenience and benefit of the wholesale distributor and quantities of the tax-exempt gasoline were diverted for retail sale in the State the entire gallonage was taxable subject

to allowance for that quantity that could be shown to be shipped in a nontaxable transaction. That case in no way controls or resembles the instant one. There is no showing of a wilful and knowing withdrawal of gasoline from the refinery; at most there is an allegation of negligence in not keeping perfect records, not having accurate meters, and in not halting the thefts of gasoline. Such a situation is not comparable to the *Austin Case, supra,* where the leasing agreements and other particulars were recognized as designed for tax evasion.

Appellants, in order to show what they term the gross negligence of appellee, state that "some time" prior to February, 1948, one Londak, a wholesale distributor, had stolen 30,000 gallons of gasoline from the refinery. The thefts were discovered as the result of a fire which occurred in Londak's truck. Examination of the truck disclosed that concealed tanks in the truck enabled Londak to steal gasoline from the refinery. This incident occurred 6 years prior to 1948 and as a result of the findings the tax authority collected the full amount of the tax from Londak. We call attention to this statement of appellants only to show appellants' efforts to reveal the gross negligence of appellee.

The trial judge stated:

"On reading this statute as a whole, it is evident that it applies only to those taxable products which are actually sold or which have been stored for the purpose of later sale."

We believe he was correct in so ruling. There seems to be no doubt that there are portions of the statute involved in the present suit which are indefinite and uncertain. The task of interpreting the statute is therefore a difficult one. We have repeatedly held that the practical construction given to obscure statutes by administrative officers will be given

weight by the court in construing such a statute. *Board of Education* v. *Goodrich,* 208 Mich 646; *Commerce-Guardian Trust & Savings Bank* v. *State of Michigan,* 228 Mich 316; *People* v. *Robinson,* 241 Mich 497. As stated by the United States supreme court in the case of *United States* v. *Jackson,* 280 US 183, 193 (50 S Ct 143; 74 L ed 361):

"It is a familiar rule of statutory construction that great weight is properly to be given to the construction consistently given to a statute by the executive department charged with its administration. * * * And such construction is not to be overturned unless clearly wrong, or unless a different construction is plainly required."

The trial judge in his written opinion cites the case of *Wayne County* v. *Auditor General,* 250 Mich 227, 232, wherein this Court stated that the terms of this act are "couched in bunglesome language." Counsel for appellants indicates that the above statement referred to a different part of this statute. That is true, but his own statements during the trial acknowledged the uncertainty of various phases of the act involved in the present suit. Inconsistent assertions during the trial and computations inconsistent with the proposed theory of liability further indicate that the statutory provisions are far from clear or free from ambiguity. A judicial interpretation of the statute was sought by appellants and they admitted that they adopted a theory and then threw it into the "lap" of the court to decide. It is the function of the court to fairly interpret a statute as it then exists; it is not the function of the court to legislate.

The decree of the lower court is affirmed. No costs are allowed, a question of public importance involving the construction of a statute being involved.

Carr, Bushnell, Sharpe, Boyles, Reid, Dethmers, and Kelly, JJ., concurred.