AMMEX, INC v DEPARTMENT OF TREASURY

Docket Nos. 260049, 265936. Submitted May 2, 2006, at Lansing. Decided October 19, 2006, at 9:00 a.m.

Ammex, Inc., which operates a fuel-selling facility near the Ambassador Bridge in Detroit, brought an action in the Court of Claims seeking a refund from the Michigan Department of Treasury of state gasoline and diesel fuel taxes it had prepaid to its Canadian supplier, claiming that because the fuel was sold at a duty-free retail facility from which vehicles were required to proceed directly to Canada, the fuel was not subject to state taxation under the motor fuel tax act, MCL 207.101 *et seq.* Ammex also brought an action against the department in the Ingham Circuit Court, seeking a declaratory ruling that the state sales tax did not apply to sales of duty-free fuel because the state sales tax act was preempted by federal law and violated several provisions of the United States Constitution. The Court of Claims, William E. Collette, J., ordered the defendant to refund the taxes that the plaintiff had paid on the ground that the federal government's extensive regulatory framework preempted Michigan from collecting taxes on duty-free fuel. Sitting also in the Ingham Circuit Court case, Judge Collette granted summary disposition to plaintiff on preemption grounds. Defendant appealed both decisions, and the appeals were consolidated.

The Court of Appeals *held*:

1. The plaintiff had standing to bring an action to recover a refund from the defendant because, according to the stipulated facts, the plaintiff bore the economic burden of the sales and motor fuel taxes and therefore suffered an injury in fact.

2. The circuit court had subject-matter jurisdiction to render a declaratory ruling that invalidated the tax assessment. Although MCL 205.22 grants exclusive jurisdiction to appeal a final assessment to the Tax Tribunal or the Court of Claims, only the circuit court has jurisdiction to entertain purely legal issues concerning the constitutional validity of state tax laws.

3. The federal scheme regulating customs bonded warehouses preempts the imposition of Michigan's motor fuel tax and sales tax

on fuel that is stored in a Class 9 customs bonded warehouse, sold duty-free, and destined for export.

Affirmed.

CONSTITUTIONAL LAW — SUPREMACY CLAUSE — PREEMPTION — STATE TAX STATUTES.

The federal scheme regulating customs bonded warehouses preempts the imposition of Michigan's motor fuel tax and sales tax on fuel that is stored in a Class 9 customs bonded warehouse, sold duty-free, and destined for export (US Const, art VI, cl 2; 19 USC 1551 *et seq.*; 19 CFR 19.1 *et seq.*; MCL 205.51 *et seq.*; MCL 207.101 *et seq.*).

*Dykema Gossett PLLC* (by *Craig L. John, Mark H. Sutton, Steven E. Grob,* and *Thomas J. Murray*) for the plaintiff.

*Michael A. Cox,* Attorney General, *Thomas L. Casey,* Solicitor General, and *Glenn R. White* and *Michael R. Bell,* Assistant Attorneys General, for the defendant.

Before: BORRELLO, P.J., and SAAD and WILDER, JJ.

BORRELLO, P.J. These consolidated cases concern whether plaintiff's sale of duty-free gasoline and diesel fuel from January 1, 2001, through March 31, 2001, at its duty-free retail facility in Detroit, Michigan, adjacent to the Ambassador Bridge, is subject to state taxation under the motor fuel tax act, MCL 207.101 *et seq.*,[1] and the General Sales Tax Act, MCL 205.51 *et seq.* In Docket No. 260049, defendant appeals as of right a judgment for plaintiff. In Docket No. 265936, defendant appeals as of right an order granting summary disposition in favor of plaintiff. For the reasons set forth in this opinion, we affirm in both cases.

---

[1] The motor fuel tax act, MCL 207.101 *et seq.*, was repealed by 2000 PA 403.

I. FACTS AND PROCEDURAL HISTORY

Plaintiff operates a United States Customs Class 9 bonded warehouse,[2] also known as a "duty-free sales enterprise"[3] or a "duty-free store,"[4] in Detroit, Michigan. The warehouse is adjacent to the entrance to the Ambassador Bridge, which links the United States and Canada. Although plaintiff's duty-free store is within the United States, it is located beyond the exit point for travelers leaving the United States and is designated as "sterile" by the United States Customs Service because it is physically designed to ensure that anyone who enters the store has no alternative but to depart from the United States and enter Canada. Duty-free products purchased at plaintiff's store are therefore necessarily exported to Canada. The property on which plaintiff's facility is located is privately owned. In addition, all the roads leading from plaintiff's duty-free store to Canada and the Ambassador Bridge are also privately owned.

Plaintiff sells a variety of products from its duty-free store, including alcoholic beverages, tobacco products, perfume, watches, and other items of tangible personal property. In September 2000, the United States Customs Service granted plaintiff permission to expand its Class 9 customs bonded warehouse operation to include its three gasoline storage tanks and three diesel fuel storage tanks at the Ambassador Bridge facility, which allowed plaintiff to sell duty-free gasoline and diesel

---

[2] Under federal law, a customs bonded warehouse is a building where imported goods may be stored, be manipulated, or undergo manufacture duty-free for a specific period. 19 USC 1555; 19 USC 1557.

[3] 19 USC 1555(b)(8)(D).

[4] 19 CFR 19.1(a)(9).

fuel.[5] In 2001, plaintiff purchased all the motor fuel sold from its duty-free retail facility in Canada from a Canadian supplier. The motor fuel was then transported to plaintiff's duty-free facility under a United States Customs "in transit" bond and stored in fuel storage tanks at plaintiff's customs bonded warehouse to be sold to customers duty-free. Plaintiff prepaid Michigan gasoline and diesel fuel taxes to its Canadian supplier from January 1, 2001, through March 31, 2001.

Plaintiff filed a claim for a refund from defendant, seeking to recoup $204,158.95 in state gasoline taxes and $178,769.27 in state diesel fuel taxes that it prepaid its Canadian supplier for the period of January 1, 2001, through March 31, 2001. Defendant denied the refund, asserting that the Michigan motor fuel tax act does not exempt the sale of duty-free gasoline and diesel fuel from motor fuel taxes. After defendant denied plaintiff's claim for a refund, plaintiff filed a complaint in the Michigan Court of Claims. In its complaint, plaintiff sought, among other relief, a declaratory judgment that federal law regulating duty-free retail facilities preempted the imposition of taxes under the motor fuel tax act, and a declaratory judgment exempting plaintiff's purchase of gasoline and diesel fuel from its Canadian supplier from state motor fuel taxes. Plaintiff also requested a refund of the state motor fuel taxes that plaintiff prepaid to its Canadian supplier for the period of January 1, 2001, through March 31, 2001.

---

[5] On November 1, 2001, the United States Customs Service revoked its authorization of plaintiff's sale of duty-free gasoline and diesel fuel from its customs bonded warehouse. However, the United States Court of Appeals for the Federal Circuit affirmed the holding of the United States Court of International Trade that the United States Customs Service abused its discretion in revoking its authorization of plaintiff's sale of duty-free gasoline and diesel fuel from its duty-free store. *Ammex, Inc v United States*, 419 F3d 1342 (CA Fed, 2005).

The case was submitted on stipulated facts to the Court of Claims. The Court of Claims held that the federal government's "extensive statutory and regulatory frameworks ... preempt[] the operation of Michigan law" and enjoined defendant from assessing and collecting Michigan motor fuel tax on plaintiff's sales of motor fuel designated as duty-free merchandise and from enforcing any agreement requiring prepayment of such taxes to plaintiff's Canadian supplier. The court also ordered defendant to refund the motor fuel tax prepaid by plaintiff for the period in question, with interest.[6] Defendant appeals this judgment in Docket No. 260049.[7]

Plaintiff also filed a complaint in the Ingham Circuit Court challenging defendant's imposition of state sales tax on plaintiff's duty-free gasoline and diesel fuel. Plaintiff sought a declaratory ruling that the state sales tax did not apply to plaintiff's duty-free operations, that federal law regulating duty-free facilities preempted the

---

[6] On March 22, 2005, this Court issued a stay pending its review of defendant's appeal. *Ammex, Inc v Dep't of Treasury*, unpublished order of the Court of Appeals, entered March 22, 2005 (Docket No. 260049).

[7] In Docket No. 260049, plaintiff urges this Court, as a preliminary matter, to make a determination that the motor fuel tax, according to the statutory language, should never have been imposed on plaintiff's purchase of gasoline and diesel fuel from its Canadian supplier. According to plaintiff, the purpose of the motor fuel tax was to prescribe a privilege tax for the use of Michigan's public highways by owners and drivers of motor vehicles, and neither plaintiff nor plaintiff's customers used motor fuel for that purpose. Thus, plaintiff contends, the motor fuel tax should not have been imposed on plaintiff's purchase of motor fuel from its Canadian supplier. We note that the trial court did not rule on this issue; therefore, it is not preserved for review. *Fast Air, Inc v Knight*, 235 Mich App 541, 549; 599 NW2d 489 (1999). However, we observe that this Court rejected this argument in *Ammex, Inc v Dep't of Treasury*, 237 Mich App 455, 470; 603 NW2d 308 (1999), although that case was decided before the United States Customs Service authorized plaintiff to sell motor fuel duty-free and therefore did not consider the implications of plaintiff's sale of duty-free gasoline and diesel fuel.

state sales tax, and that application of the state sales tax act violated numerous provisions of the United States Constitution, including the Export Clause, the Import-Export Clause, the Commerce Clause, the Equal Protection Clause, and the Due Process Clause. Plaintiff moved for summary disposition under MCR 2.116(C)(10), arguing that it was entitled to summary disposition because there was no genuine issue of fact that the assessment of state sales tax on plaintiff's duty-free sales, including its sales of gasoline and diesel fuel, was preempted by federal law because of the existence of a comprehensive federal regulatory scheme governing the operation of duty-free stores. The trial court agreed and granted plaintiff's motion for summary disposition. Defendant appeals this order in Docket No. 265936.

## II. ANALYSIS

### A. STANDING

In Docket No. 260049, defendant contends as a preliminary matter that plaintiff lacks standing to pursue an action against defendant because plaintiff did not suffer an injury in fact in light of the fact that, according to defendant, plaintiff shifted the burden of the motor fuel tax to its customers and therefore did not bear the economic burden of the motor fuel tax.[8] Thus,

---

[8] Defendant also contends on appeal that plaintiff was not a proper party to seek a motor fuel tax refund under MCL 207.112(2) because only a "purchaser" is eligible to receive a refund under MCL 207.112(2), and that plaintiff, as a retailer, did not qualify as a "purchaser" under the statute. A defendant challenging a plaintiff's legal capacity to sue under a statute must raise such an argument in the defendant's first responsive pleading or in a motion filed before that pleading. MCR 2.116(D)(2); *Glen Lake-Crystal River Watershed Riparians v Glen Lake Ass'n*, 264 Mich App 523, 528; 695 NW2d 508 (2004). Because defendant failed to raise the MCL 207.112(2) argument in its first responsive pleading or in a motion

defendant contends, refunding the motor fuel tax prepaid by plaintiff would result in plaintiff receiving a windfall. Whether a party has standing is a question of law that this Court reviews de novo. *Nat'l Wildlife Federation v Cleveland Cliffs Iron Co*, 471 Mich 608, 612; 684 NW2d 800 (2004).

Plaintiff, as the party invoking the court's jurisdiction, had the burden to establish that it had standing to pursue a cause of action for a tax refund against defendant. *Lee v Macomb Co Bd of Comm'rs*, 464 Mich 726, 740; 629 NW2d 900 (2001). There are three elements to establish standing:

> "First, the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not "conjectural" or "hypothetical." ' Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.' Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.' " [*Id.* at 739, quoting *Lujan v Defenders of Wildlife*, 504 US 555, 560-561; 112 S Ct 2130; 119 L Ed 2d 351 (1992) (citations omitted).]

Defendant's argument concerns the first element of standing: whether plaintiff suffered an injury in fact. The motor fuel tax act, MCL 207.101 *et seq.*, "imposes a tax at a specific rate per gallon on all gasoline and diesel fuel sold in Michigan or used in propelling motor

filed before that pleading, the issue is waived. *Glen Lake-Crystal River Watershed Riparians, supra* at 528. Moreover, the trial court never addressed the issue whether plaintiff had the legal capacity to seek a refund under MCL 207.112(2). An issue that is not addressed by the trial court is not preserved for review. *Fast Air, Inc, supra* at 549. We therefore decline to address defendant's claim that plaintiff was not a proper party to seek a motor fuel tax refund under MCL 207.112(2).

vehicles on the public roads and highways of Michigan."
*Ammex, Inc v Dep't of Treasury*, 237 Mich App 455, 459;
603 NW2d 308 (1999). "The purpose of the act is to
'prescribe a privilege tax for the use of the public
highways by owners and drivers of motor vehicles.' "
*Id.*, quoting *Roosevelt Oil Co v Secretary of State*, 339
Mich 679, 685; 64 NW2d 582 (1954). "Although the tax
is intended to be imposed on the ultimate consumer of
gasoline or diesel fuel, it is collected by the supplier at
the time of distribution." *Ammex, supra* at 459.

The parties stipulated that plaintiff prepaid Michi-
gan gasoline and diesel fuel taxes to its supplier from
January 1, 2001, through March 31, 2001, and that
plaintiff prepaid this tax to comply with defendant's
demands that the supplier collect the tax from plaintiff.
Defendant suggests that plaintiff shifted this cost to its
customers and therefore suffered no injury in fact. In
*Anniston Mfg Co v Davis*, 301 US 337, 348; 57 S Ct 816;
81 L Ed 1143 (1937), the United States Supreme Court
stated that, "[w]hile the taxpayer was undoubtedly hurt
when he paid the tax, if he has obtained relief through
the shifting of its burden, he is no longer in a position to
claim an actual injury . . . ." Therefore, the factual
inquiry in this case concerns whether plaintiff bore the
economic burden of the motor fuel tax itself or whether
it shifted this burden to its customers. The parties
stipulated that plaintiff posted signs informing its cus-
tomers that "duty and tax free diesel must be exported
without road tax." Furthermore, the parties stipulated
that plaintiff's sales receipts stated that "no state,
federal duty, sales motor fuel or other taxes are part of
the price." In light of the parties' stipulations, we reject
defendant's contention that the evidence revealed that
plaintiff shifted the burden of the motor fuel tax to its
customers. To the contrary, the parties' stipulations
constitute sufficient evidence to establish that plaintiff

suffered an injury in fact and therefore had standing to bring the action against defendant.

### B. JURISDICTION

In Docket No. 235936, defendant argues as a preliminary matter that the circuit court lacked subject-matter jurisdiction to render a declaratory ruling that invalidates a tax assessment because MCL 205.22 grants exclusive jurisdiction to appeal a final assessment to the Tax Tribunal or the Court of Claims. Although defendant raised this argument below, the trial court did not address it. Nevertheless, we will address it because jurisdictional issues are always subject to review. *Walsh v Taylor*, 263 Mich App 618, 622; 689 NW2d 506 (2004); see also MCR 2.116(D)(3). The existence of jurisdiction is a question of law, which we review de novo on appeal. *Trostel, Ltd v Dep't of Treasury*, 269 Mich App 433, 440; 713 NW2d 279 (2006).

Circuit courts are courts of general jurisdiction with original jurisdiction over all civil claims and remedies, except when the Michigan Constitution or a statute confers exclusive jurisdiction on another court. MCL 600.601; MCL 600.605. Pursuant to MCL 205.22(1), "[a] taxpayer aggrieved by an assessment, decision, or order of the department may appeal the contested portion of the assessment, decision, or order to the tax tribunal . . . or to the court of claims . . . ." This Court has held that under MCL 205.22, exclusive jurisdiction over such determinations lies with either the Tax Tribunal or the Court of Claims because "an appeal from either forum is made directly to this Court [; therefore], the circuit court never acquires jurisdiction over such determinations." *Kostyu v Dep't of Treasury*, 170 Mich App 123, 128; 427 NW2d 566 (1988). However,

"the circuit court continues to have jurisdiction to entertain constitutional issues concerning the validity of tax laws . . . ." *Id.*

In *Kostyu*, the plaintiff appealed a final assessment to the Tax Tribunal under MCL 205.22 and brought a concurrent action in the circuit court seeking a declaration that a certain Department of Treasury policy was unconstitutional as a violation of due process. *Id.* at 126. We held that the circuit court did not have jurisdiction over the plaintiff's declaratory judgment action because although the plaintiff "couched his complaint in the circuit court as one for declaratory judgment of purely legal issues, a review of the relief sought by [the plaintiff] reveals that he sought much more than a declaration of his legal rights." *Id.* at 129. We concluded "that the issues raised are squarely within the Tax Tribunal's jurisdiction" and that because the plaintiff's "claims involve the methodology employed by the department in arriving at a taxpayer's final income tax liability, the circuit court correctly ruled that it lacked subject matter jurisdiction." *Id.* at 130.

In contrast to the complaint in *Kostyu*, plaintiff's action for declaratory judgment in this case is accurately characterized as a purely legal issue concerning the constitutional validity of a state tax law as applied to plaintiff. Unlike the plaintiff in *Kostyu*, plaintiff in the instant case was not seeking a review of a department determination or methodology "couched" in constitutional terms. Furthermore, plaintiff was not raising an issue that fell "squarely" within the jurisdiction of the Tax Tribunal. Indeed, "the Tax Tribunal does not have jurisdiction over constitutional questions and has no authority to hold statutes invalid. . . . Rather, the circuit court has jurisdiction to consider such matters." *WPW Acquisition Co v City of Troy (On Remand)*, 254

Mich App 6, 8; 656 NW2d 881 (2002). We therefore hold that the circuit court had jurisdiction over plaintiff's claims against defendant.

### C. PREEMPTION

Defendant next argues that the state of Michigan is not preempted from imposing state motor fuel and sales tax on plaintiff's sale of gasoline and diesel fuel at plaintiff's duty-free retail facility. In Docket No. 260049, the trial court held that application of Michigan's motor fuel tax to plaintiff's sale of motor fuel at its duty-free store was preempted by the federal government's extensive statutory and regulatory scheme governing customs bonded warehouses. Similarly, in Docket No. 265936, the trial court also concluded that federal law preempted defendant's ability to impose state sales tax on motor fuel sold from plaintiff's duty-free store. We concur with the trial court.

Under the Supremacy Clause of the United States Constitution, the laws of the United States are the supreme law of the land, regardless of anything in the constitution or laws of any state to the contrary. US Const, art VI, cl 2; *LaVene v Winnebago Industries*, 266 Mich App 470, 478; 702 NW2d 652 (2005). The Supremacy Clause provides Congress with the power to preempt state law. *Duprey v Huron & Eastern R Co, Inc*, 237 Mich App 662, 665; 604 NW2d 702 (1999). However, there is a strong presumption against preemption. *LaVene, supra* at 478. Furthermore,

[p]reemption occurs only under certain conditions: (1) when a federal statute contains a clear preemption provision; (2) when there is outright or actual conflict between federal and state law; (3) where compliance with both federal and state law is in effect physically impossible; (4) where there is implicit in federal law a barrier to state

regulation; (5) where Congress has legislated comprehensively, thus occupying an entire field of regulation and leaving no room for the states to supplement federal law; or (6) where the state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress. [*Id.*]

In this case, there is no specific preemptive provision in the federal scheme regulating customs bonded warehouses. In addition, there is no outright or actual conflict between federal and state law, and compliance with both federal and state law is not in effect physically impossible. Furthermore, the United States Supreme Court has clearly held that the federal scheme regulating customs bonded warehouses does not evince a congressional intent to preempt state regulation by occupying the entire field. *Itel Containers Int'l Corp v Huddleston*, 507 US 60, 71; 113 S Ct 1095; 122 L Ed 2d 421 (1993). Thus, in order to conclude that federal law preempts Michigan's state motor fuel tax and state sales tax, this Court must conclude that "the state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress" or that "there is implicit in federal law a barrier to state regulation." *LaVene, supra* at 478.

### 1. APPLICABLE FEDERAL AND STATE LAW

"Pursuant to its powers under the Commerce Clause, Congress established a comprehensive customs system which includes provisions for Government-supervised bonded warehouses . . . ." *Xerox Corp v Harris Co, Texas*, 459 US 145, 150; 103 S Ct 523; 74 L Ed 2d 323 (1982). The federal customs warehouse scheme is "pervasive" and "provides for continual federal supervision of warehouses, strict bonding requirements, and special taxing rules . . . ." *Itel, supra* at 71. "Detailed regula-

tions control every aspect of the manner in which the warehouses are to be operated." *Xerox Corp, supra* at 150. Under the federal scheme, imports may be stored in customs bonded warehouses duty-free for prescribed periods. 19 USC 1555; 19 USC 1557(a). At any time during the prescribed period, goods stored in customs bonded warehouses may be withdrawn from the warehouse and reexported without payment of duty. 19 USC 1557(a). However, if the goods are withdrawn for domestic sale or stored beyond the prescribed period, a duty becomes due. 19 USC 1557(a). The goods stored in a bonded warehouse are in the joint custody of the United States Customs Service and the warehouse proprietor. 19 USC 1555(a).

Customs bonded warehouses are designated by class, and a duty-free store, which is used for selling duty-free merchandise for exportation, is designated as a Class 9 customs bonded warehouse. 19 CFR 19.1(a)(9). A " 'duty-free sales enterprise' . . . sells, for use outside the customs territory, duty-free merchandise that is delivered from a bonded warehouse to an airport or other exit point for exportation by, or on behalf of, individuals departing from the customs territory." 19 USC 1555(b)(8)(D). " '[D]uty-free merchandise' " is "merchandise sold by a duty-free sales enterprise on which neither Federal duty nor Federal tax has been assessed pending exportation from the customs territory." 19 USC 1555(b)(8)(E). A duty-free sales enterprise is required to "establish procedures to provide reasonable assurance that duty-free merchandise sold by the enterprise will be exported from the customs territory." 19 USC 1555(b)(3)(A). In addition, a duty-free sales enterprise is required to

> display in prominent places within its place of business notices which state clearly that any duty-free merchandise purchased from the enterprise—

(i) has not been subject to any Federal duty or tax,

(ii) if brought back into the customs territory, must be declared and is subject to Federal duty and tax, and

(iii) is subject to the customs laws and regulation of any foreign country to which it is taken. [19 USC 1555(b)(3)(C).]

In 1988, Congress amended 19 USC 1555(b), adding significant regulations to the customs bonded warehouse scheme. In findings regarding duty-free sales enterprises that accompanied the amendment, Congress found that "duty-free sales enterprises play a significant role in attracting international passengers to the United States and thereby their operations favorably affect our balance of payments" and that "concession fees derived from the operations of authorized duty-free sales enterprises constitute an important source of revenue for the State, local and other governmental authorities that collect such fees." PL 100-418, § 1908(a)(1) and (2), 102 Stat 1315.

The state motor fuel tax act in force at the relevant time provided:

(1) A specific tax at a rate of cents per gallon determined under subsection (2) is imposed on all gasoline and diesel motor fuel sold or used in producing or generating power for propelling motor vehicles used upon the public roads and highways in this state. The tax shall be paid at those times, in the manner, and by those persons specified in this act. It is the intent of this act to impose a tax upon the owners and drivers of motor vehicles using an internal combustion type of engine upon the public roads and highways of this state by requiring them to pay for the privilege of using the public roads and highways of this state, in addition to the motor vehicle license tax. [MCL 207.102, repealed by 2000 PA 403.]

"The purpose of the act is to 'prescribe a privilege tax for the use of the public highways by owners and drivers

of motor vehicles.' " *Ammex, supra* at 459, quoting
*Roosevelt, supra* at 685. "Although the tax is intended to
be imposed on the ultimate consumer of gasoline or
diesel fuel, it is collected by the supplier at the time of
distribution." *Ammex, supra* at 459. In this case, plain-
tiff, as the retailer of the motor fuel, prepaid the tax to
the supplier, and the supplier remitted the tax to the
state. "[P]laintiff, in turn, had the ability to pass on the
economic burden of the tax by including the amount of
the tax in the price of the gasoline and diesel fuel sold to
its customers." *Id.*

The General Sales Tax Act, MCL 205.51 *et seq.*,
imposes a tax on "all persons engaged in the business of
making sales at retail . . . ." MCL 205.52(1); *By Lo Oil
Co v Dep't of Treasury*, 267 Mich App 19, 50; 703 NW2d
822 (2005). "[S]ales tax is imposed on the seller for the
privilege of engaging in the business of making retail
sales of tangible personal property in Michigan." *Am-
mex, supra* at 460. "Although the legal incidence of the
sales tax falls on the retailer, the retailer is authorized
to pass the economic burden of the tax onto the pur-
chaser by collecting an equal amount at the point of
sale." *Id.* The act requires gasoline retailers to prepay
sales tax to their supplier at the time of "purchase or
shipment." MCL 205.56a(1); *By Lo Oil Co, supra* at 48.

### 2. THE PREEMPTIVE EFFECT OF THE FEDERAL CUSTOMS BONDED WAREHOUSING SCHEME

The United States Supreme Court has specifically
recognized that the federal regulatory scheme govern-
ing customs bonded warehouses preempts most state
taxes on goods stored in such warehouses. *Itel, supra* at
69. On two occasions, the United States Supreme Court
has specifically addressed the issue whether the federal
bonded warehousing scheme preempts the imposition

of state taxes on goods stored in a customs bonded warehouse and destined for exportation. In both cases, *McGoldrick v Gulf Oil Corp*, 309 US 414; 60 S Ct 664; 84 L Ed 840 (1940), and *Xerox, supra*, the Supreme Court held that state taxes were preempted by the comprehensive federal bonded warehousing scheme.

In *McGoldrick*, the city of New York sought to impose sales tax on fuel oil that was manufactured in a Class 6 customs bonded warehouse from imported petroleum and then sold to "foreign bound vessels in New York City which purchased the oil as ships' stores for consumption as fuel in propelling them in foreign commerce." *McGoldrick, supra* at 422. The Court found that the purpose of the federal exemption from the tax normally laid upon the importation of crude oil was "to encourage importation of the crude oil for such use and thus to enable American refiners to meet foreign competition and to recover trade which had been lost by the imposition of the tax." *Id.* at 427. In ruling that the state tax was preempted, the Supreme Court stated:

> In furtherance of that end Congress provided for the segregation of the imported merchandise from the mass of goods within the state, prescribed the procedure to insure its use for the intended purpose, and by reference confirmed and adopted customs regulations prescribing that the merchandise, while in bonded warehouse, should be free from state taxation. It is evident that the purpose of the Congressional regulation of the commerce would fail if the state were free at any stage of the transaction to impose a tax which would lessen the competitive advantage conferred on the importer by Congress, and which might equal or exceed the remitted import duty. The Congressional regulation, read in the light of its purpose, is tantamount to a declaration that in order to accomplish constitutionally permissible ends, the imported merchandise shall not become a part of the common mass of taxable property within the state, pending its disposition as ships' stores and shall

not become subject to the state taxing power. . . . The state tax in the circumstances must fail as an infringement of the Congressional regulation of the commerce. [*Id.* at 428-429 (citations omitted).]

Although customs regulations at the time specifically exempted imported goods in bonded warehouses from state taxation, the Supreme Court explicitly declined to rely on the regulations and instead concluded that the regulations "state[] only what is implicit in the Congressional regulation of commerce presently involved."[9] *Id.* at 429.

In *Xerox,* the Supreme Court similarly struck down a state property tax on goods stored in a customs bonded warehouse and destined for foreign markets, concluding that such a tax was "pre-empted by Congress' comprehensive regulation of customs duties." *Xerox Corp, supra* at 154. In *Xerox,* the city of Houston and Harris County assessed ad valorem personal property taxes on photocopiers stored in a Class 3 customs bonded warehouse. *Id.* at 148. Xerox manufactured the copiers for sale in Latin America, and all printing on the machines and operating instructions were in Spanish or Portuguese. *Id.* at 147. In addition, the machines as constructed would not operate on the electrical current standard in the United States. *Id.* It would have cost approximately $100 to convert each copier for domestic

---

[9] In *Xerox, supra* at 152 n 8, the United States Supreme Court noted that the provision exempting imported goods in bonded warehouses from state taxation referenced in *McGoldrick* was located in a footnote of the regulations governing customs bonded warehouses. However, the Supreme Court further observed that "[a] recent amendment to the regulations deleted this footnote on November 1, 1982, effective December 1, 1982. 47 Fed. Reg. 49370. The Treasury Department offered no explanation for the amendment. The deletion of footnote 11 without explanation does not alter our conclusion that the ad valorem taxes here are pre-empted by the statutory scheme." *Id.* at 152-153 n 8.

sale, and none of the copiers was ever sold to a customer for domestic use. *Id.* at 147-148.

In *Xerox*, the United States Supreme Court first reviewed the comprehensive federal bonded warehousing scheme and noted that by enacting the scheme, "Congress created secure and duty-free enclaves under federal control in order to encourage merchants here and abroad to make use of American ports." *Id.* at 151. The Supreme Court framed the question before it as "whether it would be compatible with the comprehensive scheme Congress enacted to effect these goals if the states were free to tax such goods while they were lodged temporarily in Government-regulated bonded storage in this country." *Id.* In concluding that the state property tax was preempted by the comprehensive federal regulation of customs bonded warehouses, the Supreme Court stated:

> The analysis in *McGoldrick* applies with full force here. First, Congress sought, in the statutory scheme reviewed in *McGoldrick*, to benefit American industry by remitting duties otherwise due. The import tax on crude oil was remitted to benefit oil refiners employing labor at refineries within the United States, whose products would not be sold in domestic commerce. Here, the remission of duties benefited those shippers using American ports as transshipment centers. Second, the system of customs regulation is as pervasive for the stored goods in the present case as it was in *McGoldrick* for the refined petroleum. In both cases, the imported goods were segregated in warehouses under continual federal custody and supervision. Finally, the state tax was large enough in each case to offset substantially the very benefits Congress intended to confer by remitting the duty. In short, freedom from state taxation is as necessary to the congressional scheme here as it was in *McGoldrick*. [*Id.* at 153.]

Despite the Supreme Court's recognition that the federal regulatory scheme governing customs bonded

warehouses preempts most state taxes on goods stored in such warehouses, *Itel, supra* at 69, the Supreme Court has not always concluded that state taxes on goods stored in customs bonded warehouses are preempted. In *RJ Reynolds Tobacco Co v Durham Co, North Carolina,* 479 US 130, 152; 107 S Ct 499; 93 L Ed 2d 449 (1986), the Supreme Court held that the federal customs bonded warehousing scheme did not preempt the state of North Carolina from imposing a "nondiscriminatory ad valorem property tax on imported goods [tobacco] stored in a customs-bonded warehouse and destined for domestic manufacture and sale." R.J. Reynolds Tobacco Company (Reynolds) imported foreign tobacco into a customs bonded warehouse where it allowed the tobacco to age for two years before withdrawing it from the warehouse to process for use in the United States. *Id.* at 133-134. Reynolds paid the required customs duties upon withdrawal of tobacco from the bonded warehouses. *Id.* at 134. However, Reynolds objected to North Carolina's imposition of property taxes on the imported tobacco stored in bonded warehouses, arguing that it was immune from state taxation based on the Supreme Court's ruling in *Xerox. Id.* at 134-135.

In *RJ Reynolds,* the Supreme Court framed the issue as follows: "the crucial issue is whether Congress has exercised its power under the Supremacy Clause to pre-empt ad valorem state taxation of imported goods that are stored in customs-bonded warehouses *and that are destined for domestic markets." Id.* at 140 (emphasis added). The Supreme Court concluded that the federal scheme of customs bonded warehouses did not preempt a state property tax on imported tobacco stored in customs bonded warehouses, reasoning that the bonded warehousing scheme did not evince a congressional intent to occupy the field completely because "the

current regulations, while detailed, appear to contemplate some concurrent state regulation and, arguably, even state taxation." *Id.* at 149. Critical to the Supreme Court's holding was the fact that the tobacco in that case was "destined for domestic manufacture and sale," and not intended for exportation. *Id.* at 152. In reaching its holding, the Supreme Court rejected the conclusion that the holding in *Xerox* "precludes state taxation of *any* goods in a customs warehouse, regardless of their destination." *Id.* at 143 (emphasis in original). According to the Supreme Court, *Xerox*'s holding that " 'state property taxes on goods stored under bond in a customs warehouse are pre-empted by Congress' comprehensive regulation of customs duties' " was "limited to the factual situation presented in that case, that is, where the goods are intended for transshipment." *Id.* at 143-144, quoting *Xerox, supra* at 154. Furthermore, the Supreme Court also expressly limited its holding in *RJ Reynolds*, stating, "[w]e make no determination with respect to warehoused goods that are not, as are those here, destined for the domestic market." *Id.* at 148 n 17.

### 3. APPLYING THE PREEMPTION DOCTRINE TO MICHIGAN'S MOTOR FUEL TAX STATUTES

In light of the United States Supreme Court's decisions in *McGoldrick* and *Xerox*, we conclude that imposition of the state motor fuel tax and the state sales tax are preempted by the comprehensive federal regulation of customs bonded warehouses because "the state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress[.]" *LaVene, supra* at 478.

The legal analysis used by the Supreme Court in *McGoldrick* and *Xerox* applies to the facts of this case. As recognized in *McGoldrick* and *Xerox*, the federal

regulatory scheme for customs bonded warehouses evinces a congressional intent "to benefit American industry by remitting duties otherwise due." *Xerox, supra* at 153. The remission of import taxes on motor fuel benefited American industry by remitting duties otherwise due on gasoline and diesel fuel. Furthermore, the system of customs regulation is equally pervasive for the stored goods in the present case as it was in *McGoldrick* and *Xerox. Id.* As in *McGoldrick* and *Xerox*, the motor fuel was segregated in a Class 9 customs bonded warehouse "from the mass of goods within the state." *McGoldrick, supra* at 428-429. Furthermore, the gasoline, diesel fuel, and other merchandise sold at plaintiff's duty-free store at the Ambassador Bridge were under the continuous control and supervision of the United States Customs Service from the time they entered the bonded warehouse until they were sold as duty-free merchandise to consumers leaving the country. Finally, the amounts of state sales tax and motor fuel tax were "large enough . . . to offset substantially the very benefits Congress intended to confer by remitting the duty." *Xerox, supra* at 153. Just for the period from January 1, 2001, through March 31, 2001, plaintiff paid $204,158.95 in state gasoline taxes and $178,769.27 in state diesel fuel taxes. Furthermore the amount of sales tax defendant asserted that plaintiff owed for the 2001 tax year, according to the letter of inquiry issued pursuant to MCL 205.21(2)(a), was $872,768.59 (excluding penalty and interest). These amounts are substantial and were large enough to substantially offset the benefits Congress intended to confer by remitting the duty.[10]

---

[10] The conclusion that state sales and motor fuel taxes are preempted by the comprehensive federal scheme regulating customs bonded warehouses is also underscored by Congress's findings in amending 19 USC 1555(b) in 1988. Duty-free enterprises encourage the use of "American

Defendant argues that the application of Michigan's sales tax to plaintiff does not conflict with the purposes of the customs bonded warehousing scheme and that United States Supreme Court precedent is distinguishable because the sales tax here is imposed on the retailer, not on an importer or exporter storing an inventory of goods destined for foreign commerce. We reject defendant's attempts to distinguish this case from *McGoldrick* and *Xerox* on this basis. In *McGoldrick*, the United States Supreme Court concluded that the bonded warehousing scheme preempted the application of New York state sales tax on fuel oil that was purchased by foreign bound ships "as ships' stores for consumption as fuel in propelling them in foreign commerce." *McGoldrick, supra* at 422. In *McGoldrick*, the Supreme Court stated: "It is evident that the purpose of the Congressional regulation of commerce would fail if the state were free *at any stage of the transaction* to impose a tax which would lessen the competitive advantage conferred on the importer by Congress, and which might equal or exceed the remitted import duty." *Id.* at 429 (emphasis added). Regardless of whether plaintiff is characterized as a retailer or an exporter, imposition of the sales tax would lessen the advantage conferred by remission of the duty on motor fuel. Furthermore, in *Itel,* the Supreme Court noted that the bonded warehousing scheme encourages importers to use American facilities by allowing the importer flexibility with regard to whether the goods are ultimately placed in domestic markets or exported. *Itel,*

ports," here duty-free enclaves, by importers and international passengers and improve the balance of trade by encouraging the purchase of goods for export. Such "duty-free sales enterprises play a significant role in attracting international passengers to the United States and thereby their operations favorably affect our balance of payments[.]" PL 100-418, § 1908(a)(1), 102 Stat 1315.

*supra* at 70. The Court noted that "[t]his federal objective would be frustrated by the imposition of state sales . . . taxes on goods not destined for domestic distribution . . . ." *Id.* Here, the federal objectives behind duty-free enterprises, while not identical to those outlined by the Supreme Court, are analogous. In addition to attracting the use of American facilities by importers seeking to have their goods sold duty-free, the duty-free enterprises attract "international passengers" and improve the balance of trade by encouraging the purchase of goods for export. PL 100-418, § 1908(a)(1), 102 Stat 1315. Here, the gasoline at issue is imported under bond, stored under bond, and then sold for immediate export. The application of tax "at any stage of the transaction" lessens the benefits Congress sought to confer on importers and international travelers. Moreover, unlike the tobacco in *RJ Reynolds*, the gasoline is not "destined for domestic markets." *RJ Reynolds, supra* at 148.

Defendant argues that imposition of the motor fuel tax in this context does not conflict with the congressional objectives outlined in *Xerox* because a portion of the duty-free gasoline or diesel fuel is necessarily used domestically when purchasers of the duty-free motor fuel travel from plaintiff's duty-free store to the Canadian border. Thus, defendant argues, the state taxes do not conflict with the stimulation of foreign commerce. However, we reject defendant's contention that this brief domestic *use* of a small quantity of the duty-free motor fuel within the United States and the stimulation of foreign commerce are mutually exclusive propositions.[11] Moreover, because plaintiff's duty-free facility,

---

[11] We observe that in *Ammex, supra* at 465, this Court stated that "[b]ecause a portion of the fuel purchased by each of plaintiff's customers was necessarily used within the United States, the transactions at issue

as a sterile facility, is located beyond the exit point for travelers leaving the United States and is physically designed to ensure that anyone who enters the facility has no alternative but to depart from the United States and enter Canada, the fuel in this case, unlike the tobacco in *RJ Reynolds,* is destined "for exportation by . . . individuals departing the customs territory." 19 USC 1555(b)(8)(D). Given the sterile design of plaintiff's duty-free store, motor fuel purchased by plaintiff's customers is therefore *necessarily* exported to Canada. The brief use of such a small quantity of the fuel within Michigan is incidental to its exportation by the international traveler and is not inconsistent with the attraction of "international passengers" and the improvement of the balance of trade by encouraging the purchase of goods for export. Indeed, many items sold in a duty-free shop, such as cigarettes or perfume, for example, could also be partially consumed before their actual exportation. This does not alter the fact that the purchase of such items stimulates foreign commerce even if a small portion of the products are consumed in the United States in the short time after purchase at

in this case did not involve exportation." However, we reached that conclusion in the context of holding that gasoline and diesel fuel did not constitute "exports" within the meaning of the Import-Export Clause of the United States Constitution. The holding in *Ammex* does not affect our decision here because that case was decided before the United States Customs Service authorized plaintiff to sell duty-free gasoline and diesel fuel from its customs bonded warehouse and the preemption issue, which is the core issue in the instant case, was therefore not at issue in that case. Moreover, given the extensive federal regulation of customs bonded warehouses and the fact that items purchased from plaintiff's duty-free store are necessarily exported to Canada given its designation as a "sterile" store, the conclusion in *Ammex* that motor fuel is not an "export" within the meaning of the Import-Export Clause is not necessarily inconsistent with the conclusion that the duty-free motor fuel at issue in this case was destined for exportation to Canada and not intended for domestic use.

plaintiff's duty-free facility and before exportation to Canada because the goods are necessarily exported to Canada given the sterile design of plaintiff's duty-free store.

We decline to address defendant's remaining arguments regarding preemption because those arguments would require this Court to consider issues that are not properly before this Court or were not adequately briefed or preserved for appeal.

### III. CONCLUSION

In sum, we conclude that the comprehensive federal scheme regulating customs bonded warehouses preempts the imposition of Michigan's motor fuel tax and sales tax on gasoline and diesel fuel stored in a Class 9 customs bonded warehouse and sold as duty-free because the imposition of these particular taxes is an obstacle to the accomplishment and execution of the full objectives of Congress. In light of our conclusion, we need not address defendant's arguments that application of the sales tax violated the Commerce Clause and the Import-Export Clause of the United States Constitution.

Affirmed.