AMMEX, INC v DEPARTMENT OF TREASURY

Docket No. 258901. Submitted September 12, 2006, at Detroit. Decided January 18, 2007, at 9:00 a.m. Leave to appeal sought.

Ammex, Inc., which operates two duty-free stores in Detroit on the United States-Canada border, brought an action in the Court of Claims to challenge the Michigan Department of Treasury's assessments under the Single Business Tax Act (SBTA), MCL 208.1 *et seq.*, for tax years 1993 to 1995. The Court of Claims, William E. Collette, J., granted summary disposition to the Department of Treasury after determining that Ammex's duty-free sales were Michigan sales for purposes of calculating Ammex's adjusted tax base under the SBTA. Ammex appealed.

The Court of Appeals *held*:

1. As its street addresses indicate, Ammex's duty-free facilities are located within Michigan, and Ammex has availed itself of Michigan's resources. Therefore, because the SBTA taxes economic activity rather than goods, the single business tax applies to Ammex regardless of the facts that the merchandise itself never enters Michigan and that the federal government has an interest in the foreign commerce that occurs on the property.

2. The SBTA does not violate the Supremacy Clause of the United States Constitution, US Const, art VI, cl 2, because there was no clear preemption by federal statute and the SBTA, as a tax on general business activity rather than on sales or property, is not an obstacle to Congress's objectives in regulating customs bonded warehouses, such as attracting international passengers to the United States. Further, the SBTA does not conflict with federal law and does not make compliance with federal law impossible. Federal law creates no barrier to state taxation, and the United States Supreme Court has held that Congress did not intend to preempt all state taxation of goods in bonded warehouses by occupying the field of bonded-warehouse regulation. The recent case holding that federal law preempts application of Michigan's motor fuel tax act, MCL 207.101 *et*

*seq.*, and general sales tax act, MCL 205.51 *et seq.*, to Ammex is distinguishable because the single business tax is a value-added tax, not a direct tax.

3. Application of the SBTA to Ammex does not violate the Commerce Clause of the United States Constitution, US Const, art I, § 8, cl 3. Ammex conducts its business in Michigan, which gives it a substantial nexus with the state; the tax is not imposed on international transactions but on the value added by a Michigan business, so it is not unfairly apportioned; the tax does not discriminate against interstate commerce; the tax is fairly related to the benefits and protections that Michigan's government and laws provide; the tax creates no risk of international multiple taxation because it applies only to business activity apportioned to Michigan; and the tax does not prevent the federal government from "speaking with one voice" when regulating commerce with Canada because the tax does not apply to goods exported to Canada, but to Ammex's Michigan business activities as a whole.

4. Application of the SBTA to Ammex does not violate the Import-Export Clause of the United States Constitution, US Const, art I, § 10, cl 2. The tax does not disturb the harmony among the states because it applies only to business activity within Michigan, it does not prevent the federal government from "speaking with one voice" when regulating international commerce, and it does not divert revenues from the federal government because it only applies to business activity within Michigan.

5. The Court of Claims properly granted summary disposition to the Department of Treasury because, under the plain language of the SBTA, there was no factual question whether Ammex's primary business activity occurred within Michigan and was taxable. Ammex's sales are considered to be within Michigan because the facilities where it delivers tangible personal property to its customers are located in Michigan. Contrary to Ammex's argument, its sales cannot be classified as "export sales" for purposes of apportionment because it is Ammex's customers, not Ammex, who export its goods. Further, Ammex's sales cannot be considered "dock sales" because, apart from the fact that the letter ruling on which Ammex relies is not binding, Ammex's customers do not take legal title and delivery of the goods in another state, then transport the merchandise to Michigan; nor can the sales be considered Canadian sales in light of the fact that Ammex is not a Canadian corporation.

6. The Court of Claims erred in applying too narrowly the statutory provision governing whether a taxpayer may apportion its tax base. The apportionment provision applies when another

political entity has jurisdiction to impose any of several taxes, not just an "SBT-like" tax, and it applies regardless of whether the political entity that has jurisdiction to tax actually does impose one of the enumerated taxes. However, Ammex submitted no relevant evidence demonstrating that its business activities were actually subject to any of the enumerated taxes, and Ammex's affidavit regarding the intangible sales it conducted in Canada clearly indicated that such sales did not constitute the greater proportion of its services, thereby rendering them "in this state" for SBTA purposes. Therefore, Ammex was not entitled to apportion any of its sales.

Affirmed.

1. TAXATION — SINGLE BUSINESS TAX ACT — DUTY-FREE STORES.

The single business tax applies to duty-free stores that are located in Michigan and use the state's resources regardless of the fact that the merchandise they sell never enters Michigan after sale (MCL 208.1 *et seq.*).

2. CONSTITUTIONAL LAW — SUPREMACY CLAUSE — SINGLE BUSINESS TAX ACT.

The Single Business Tax Act does not violate the Supremacy Clause of the United States Constitution because the single business tax, as a tax on general business activity rather than on sales or property, is not an obstacle to Congress's objectives in regulating customs bonded warehouses (US Const, art VI, cl 2; 19 USC 1202 *et seq.*; MCL 208.1 *et seq.*).

3. CONSTITUTIONAL LAW — COMMERCE CLAUSE — SINGLE BUSINESS TAX ACT.

The imposition of the single business tax on duty-free stores located in Michigan does not violate the Commerce Clause of the United States Constitution (US Const, art I, § 8, cl 3; MCL 208.1 *et seq.*).

4. CONSTITUTIONAL LAW — IMPORT-EXPORT CLAUSE — SINGLE BUSINESS TAX ACT.

The imposition of the single business tax on duty-free stores located in Michigan does not violate the Import-Export Clause of the United States Constitution (US Const, art I, § 10, cl 2; MCL 208.1 *et seq.*).

5. TAXATION — SINGLE BUSINESS TAX ACT — APPORTIONMENT.

The apportionment provision of the Single Business Tax Act applies when another political entity has jurisdiction to impose any of several enumerated taxes, regardless of whether the political entity that has jurisdiction to tax actually does impose one of the enumerated taxes (MCL 208.42).

*Dykema Gossett PLLC* (by *Craig L. John* and *Thomas J. Murray*) for the plaintiff.

*Michael A. Cox*, Attorney General, *Thomas L. Casey*, Solicitor General, and *Roland Hwang*, Assistant Attorney General, for the defendant.

Before: WHITBECK, C.J., and HOEKSTRA and WILDER, JJ.

PER CURIAM. Plaintiff Ammex, Inc. (Ammex), appeals as of right the Court of Claims opinion and order granting summary disposition to defendant Michigan Department of Treasury. Ammex brought suit challenging the Department of Treasury's assessments under the Single Business Tax Act (SBTA), MCL 208.1 *et seq.*,[1] imposing a single business tax (SBT) on Ammex's business activities in tax years 1993, 1994, and 1995. We hold that imposition of the SBT on Ammex is constitutional, that Ammex's duty-free sales are Michigan sales subject to the SBT, and that on the record presented, Ammex is not entitled to apportion any of its sales, either tangible or intangible, to Canada. Therefore, we affirm.

### I. BASIC FACTS AND PROCEDURAL HISTORY

Ammex is a Michigan corporation with its principal office located in Warren, Michigan. Relevant to this appeal, Ammex owns and maintains two United States Customs Class 9 bonded warehouses,[2] also known as

---

[1] Effective December 31, 2007, the SBTA will have been repealed. 2006 PA 325.

[2] "[A] customs bonded warehouse is a building where imported goods may be stored, manipulated, or undergo manufacture duty-free for a specific period." *Ammex, Inc v Dep't of Treasury*, 272 Mich App 486, 488 n 2; 726 NW2d 755 (2006), citing 19 USC 1555; 19 USC 1557.

"duty-free stores"[3] or "duty-free sales enterprises."[4] One of the stores is located at 3400 West Lafayette Boulevard, immediately adjacent to the Ambassador Bridge; the other is located at 100 East Jefferson Drive, immediately adjacent to the Detroit-Windsor Tunnel. Ammex sells a variety of goods at its duty-free stores, including alcoholic beverages, tobacco products, perfume, watches, and other tangible personal property. Ammex also sells motor fuel from the Ambassador Bridge facility.

Both stores are situated on private property located in Detroit, Michigan, that Ammex leases from the Detroit International Bridge Company (DIBC).[5] Further, both of these stores are located beyond "the point of no return," which is an area beyond the United States customs exit point[6] and which links the United

---

[3] A "duty-free store" is a bonded warehouse "used for selling, for use outside the Customs territory, conditionally duty-free merchandise owned or sold by the proprietor and delivered from the Class 9 warehouse to an airport or other exit point for exportation by, or on behalf of, individuals departing from the Customs territory for destinations other than foreign trade zones." 19 CFR 19.1(a)(9).

[4] " '[D]uty-free sales enterprise' means a person that sells, for use outside the customs territory, duty-free merchandise that is delivered from a bonded warehouse to an airport or other exit point for exportation by, or on behalf of, individuals departing from the customs territory." 19 USC 1555(b)(8)(D). " '[D]uty-free merchandise' means merchandise sold by a duty-free sales enterprise on which neither Federal duty nor Federal tax has been assessed pending exportation from the customs territory." 19 USC 1555(b)(8)(E).

[5] DIBC does not own the property in fee simple, but rather by an easement subject to reverter that restricts its use for public purposes. See *Detroit Int'l Bridge Co v American Seed Co*, 249 Mich 289, 297; 228 NW 791 (1930).

[6] " '[E]xit point' means the area in close proximity to an actual exit for departing from the customs territory, including the gate holding area in the case of an airport, but only if there is reasonable assurance that duty-free merchandise delivered in the gate holding area will be exported from the customs territory." 19 USC 1555(b)(8)(F).

States and Canada.[7] Once a customer exits one of these "sterile"[8] Ammex facilities, that customer may not immediately return to the United States but must enter Canada, where the customer must pay any duties or taxes owed to Canadian Customs.[9] If such goods are brought back to the United States, they must be declared to U.S. Customs and are at that time subject to federal duty and tax.[10]

Ammex also provides financial services to Ambassador Money Exchange, Ltd. (AME), an Ontario corporation. Ammex claims that it was subject to tax withholding in Canada on fees AME paid to Ammex.

In its tax returns for 1993, 1994, and 1995, Ammex took the position that its business activities were taxable both within and without Michigan and that, therefore, it was required to apportion its tax base according to MCL 208.41.[11] Accordingly, Ammex computed the sales factor of its apportionment formula to be zero, claiming that all its sales were non-Michigan sales. On review, the Department of Treasury disallowed that apportionment and determined final assessments. Ammex paid the assessments under protest and then brought this suit for a refund of the single business taxes paid, plus interest. The Court of Claims deter-

---

[7] "Customers entering Ammex's facility have necessarily proceeded beyond the 'point of no return,' having exited from the United States." *Ammex, Inc v United States*, 334 F3d 1052, 1054 (CA Fed, 2003).

[8] "The designation 'sterile' indicates that the physical design and operation of the facility guarantees the exportation of products sold therein." *Ammex, Inc, supra* at 1054.

[9] 19 USC 1555(b)(3)(C)(iii).

[10] 19 USC 1555(b)(3)(C)(ii).

[11] MCL 208.41 states: "A taxpayer whose business activities are taxable both within and without this state, shall apportion his tax base as provided in this chapter." "This chapter," as used in this provision, refers to the SBTA.

mined that Ammex's duty-free sales were in fact "Michigan sales" for purposes of calculating Ammex's adjusted tax base under the SBTA and granted summary disposition to the Department of Treasury. The Court of Claims characterized Ammex's argument as an attempt to extend the tax exemptions that run with the goods it sells to its sales activities, thereby exempting these activities from SBT liability. The Court of Claims denied Ammex's motion for reconsideration. Ammex now appeals.

## II. OVERVIEW OF THE SINGLE BUSINESS TAX

The SBT is a form of value-added tax, which is a tax imposed on " 'economic activity itself and [which] can be described in two ways: as a tax on the economic actor's use of the scarce resources of society, or as a tax on the value the economic actor adds to the economy.' " *Fluor Enterprises, Inc v Dep't of Treasury*, 265 Mich App 711, 715; 697 NW2d 539 (2005), quoting *Mobil Oil Corp v Dep't of Treasury*, 422 Mich 473, 493; 373 NW2d 730 (1985). The SBT is a tax imposed on the privilege of doing business in Michigan, and not on income. MCL 208.31(3); *Guardian Photo, Inc v Dep't of Treasury*, 243 Mich App 270, 277; 621 NW2d 233 (2000). "It taxes what a business has added to the economy, as distinguished from the income tax's taxation of what the business has derived from the economy." *Guardian Photo, supra* at 277. Stated differently, a value-added tax " 'taxes the use of the resources of society; the income tax taxes the return received for supplying those resources to the economy.' " *Fluor Enterprises, supra* at 716, quoting *Mobil Oil, supra* at 494-495.

The SBTA imposes "a specific tax upon the adjusted tax base of every person with business activity in this state that is allocated or apportioned to this state . . . ."

MCL 208.31(1).[12] "Business activity" includes the transfer of legal title to tangible personal property "made or engaged in, within this state, whether in intrastate, interstate, or foreign commerce, with the object of gain, benefit, or advantage, whether direct or indirect, to the taxpayer or to others . . . ." MCL 208.3(2). " 'Tax base' means business income, before apportionment or allocation . . . , even if zero or negative, subject to . . . adjustments . . . ." MCL 208.9(1). " 'Business income' means federal taxable income . . . ." MCL 208.3(3).

The first step in calculating the SBT is to determine the taxpayer's tax base. *Fluor Enterprises, supra* at 716; *Caterpillar, Inc v Dep't of Treasury*, 440 Mich 400, 409; 488 NW2d 182 (1992). But calculation of Ammex's tax base is not at issue here. The second step in calculating SBT liability is allocation or apportionment. *Fluor Enterprises, supra* at 716; *Caterpillar, supra* at 409. The SBTA provides a three-factor formula for apportioning the tax base between two or more jurisdictions whereby the total tax base is multiplied by the portion of business activity attributable to Michigan. *Fluor Enterprises, supra* at 717; *Caterpillar, supra* at 409 n 12. The portion of business activity attributable to Michigan is the average of three ratios: "(1) Michigan payroll to total payroll, (2) Michigan property to total property, and (3) Michigan sales to total sales." *Trinova Corp v Michigan Dep't of Treasury*, 498 US 358, 367-368; 111 S

---

[12] Notably, the United States Supreme Court has clarified that the SBT is not a tax on "business activity" per se, but rather a tax *"upon the adjusted tax base* of every person *with business activity in this state* which is allocated or apportioned to this state." *Trinova Corp v Mich Dep't of Treasury*, 498 US 358, 374; 111 S Ct 818; 112 L Ed 2d 884 (1991) (*Trinova II*), quoting MCL 208.31(1) (emphasis supplied by *Trinova II*). Contra *Trinova Corp v Dep't of Treasury*, 433 Mich 141, 149; 445 NW2d 428 (1989) (*Trinova I*) (stating that "a value added tax is a tax upon business activity.").

Ct 818; 112 L Ed 2d 884 (1991), citing MCL 208.45, 208.46, 208.49, and 208.51. As will be discussed later, Ammex takes issue with the third factor, known as the sales factor. After apportionment, the tax base is subject to several additional adjustments, *Caterpillar*, *supra* at 409, but such adjustments are not at issue in this case.

### III. AMMEX'S CONNECTION WITH MICHIGAN

Ammex argues that it should not be subject to the SBT because the sales at its duty-free facilities do not occur in Michigan, but rather in an indeterminate locale between the United States and Canada that is subject solely to regulation by the United States Customs Service. Ammex supports its argument by explaining that merchandise obtained for export resale is required by law to be stored in a United States Customs Class 9 bonded warehouse under bond to assure that it does not enter the United States. When the merchandise leaves the warehouse, it is irreversibly in the stream of export destined for Canada. Thus, Ammex contends, such merchandise never enters Michigan for use or distribution.

However, the focus of the SBTA is on taxing the economic activity itself rather than the goods. The SBT is a tax imposed for the privilege of doing business in Michigan and taxes the economic actor's use of the scarce resources of society. MCL 208.31(3); *Fluor Enterprises*, *supra* at 715; *Guardian Photo*, *supra* at 277. Thus, we find it irrelevant that the goods transported to Ammex's facilities are deemed, as part of an elaborate legal fiction, to be outside the reach of federal taxation and duties, despite the fact that they undoubtedly find actual and physical, albeit temporary, rest upon United States soil. Two things *are* relevant: (1) the locale of

Ammex's facilities and (2) its enjoyment of the privilege of utilizing Michigan's resources.

As mentioned, Ammex is a registered Michigan corporation. Ammex's Ambassador Bridge store is located at 3400 West Lafayette Boulevard, and its Detroit-Windsor Tunnel store is located at 100 East Jefferson Drive. Both addresses are in *Detroit, Michigan*. Ammex also owns a Class 9 bonded warehouse at 2000 Howard Street in *Detroit, Michigan*. Further, the Detroit City Council, the Detroit Traffic Engineering Department, and the Detroit Department of Buildings and Safety Engineering have all had a role in approving construction projects inside the area located past the "point of no return." See *Detroit Int'l Bridge Co v Detroit*, unpublished opinion per curiam of the Court of Appeals, issued September 14, 2006 (Docket Nos. 257369 and 257415).

Indeed, the recent decision in *Detroit Int'l Bridge Co v Detroit* is persuasive. In that case, this Court held that DIBC, the entity from which Ammex leases the property where its facilities are located, is not a federal instrumentality and that federal law does not preempt application of Detroit zoning ordinances to the subject property. *Id.*, slip op at 12. In doing so, this Court specifically rejected DIBC's argument that it was not subject to Detroit zoning ordinances because its planned projects were within an area " 'maintained under contract with the federal government for the essential governmental purpose of conducting customs, naturalization and border control functions.' " *Id.*, slip op at 4-5. This Court made clear that, although Congress authorized the construction of the Ambassador Bridge and its approaches, the federal government held only a permissive, supervisory role in relation to the property, which this Court repeatedly emphasized is

owned by DIBC. *Id.*, slip op at 2, 3, 7, 10. This Court explained: "Federal agencies do not now operate or maintain the Bridge. Rather, federal agencies only assert control over DIBC employees to accomplish their own limited operational objectives. . . . *DIBC is a private Michigan corporation using the Bridge and accessory buildings for its own commercial activities.*" *Id.*, slip op at 8 (emphasis added).

Quoting the Michigan Supreme Court, this Court further explained:

> "The bridge is not exclusively a national or state purpose. The federal government is interested in it by virtue of its constitutional authority over navigation, interstate and foreign commerce and post roads. But it did not originate, adopt, nor aid the project. Its function is merely supervisory and permissive. *The State is interested in the extension of its highway system to the state boundary in the Detroit river, an indubitably state purpose, and is the source of the power to construct the bridge.*" [*Id.*, slip op at 7, quoting *American Seed Co, supra* at 298 (emphasis added).]

Moreover, this Court pointed out that "there is no federal statute, regulation or rule that regulates the land use of areas immediately surrounding an international Bridge." *Detroit Int'l Bridge Co, supra,* slip op at 10.

Ammex also enjoys the protection of local police, whose services it has called upon in the past. See *Commodities Export Co v Detroit,* 116 Mich App 57, 60; 321 NW2d 842 (1982). Indeed, the state retains police power over the bridge. *American Seed Co, supra* at 299. In addition, all but one of the gasoline pumps at the Ambassador Bridge Plaza have stickers from the Michigan Department of Agriculture, indicating that the fuel sold meets Michigan quality and purity standards.

From the foregoing, we conclude that Ammex's duty-free facilities are located within this state and that

Ammex enjoys the privilege of utilizing Michigan's resources. That the federal government has an interest in the foreign commerce that takes place on the property does not negate the fact that the land on which Ammex's facilities are located is owned by a private Michigan corporation engaged in private, commercial activities and over which the state of Michigan retains a governmental interest for matters related to zoning, police powers, and regulatory approval. Thus, contrary to Ammex's position, the property is not owned by United States Customs, nor is it physically controlled by United States Customs to the exclusion of Michigan officials.

Nevertheless, in support of its argument that its business is not located in Michigan, Ammex relies on *Ammex, Inc v United States*, 334 F3d 1052, 1054 (CA Fed, 2003), in which the court specifically stated, "Customers entering Ammex's facility have necessarily proceeded beyond the 'point of no return,' *having exited from the United States.*" (Emphasis added.) According to Ammex, this statement confirms that its facilities are not located in the United States, let alone Michigan. However, in that same discussion, the court also stated that "[t]he store is located on West Lafayette Street *in Detroit, Michigan*, adjacent to the Ambassador Bridge connecting the United States and Canada." *Id.* (emphasis added). Again, the existence of "sterile" facilities that guarantee the exportation of goods sold therein is simply a legal fiction created to allow certain goods to be sold duty-free to customers who then transport the goods directly to Canada. Indeed, this Court has recently issued a published opinion explaining that Ammex's duty-free facilities are located within the United States, and more specifically, in Detroit, Michigan, irrespective of their "sterile" designation:

> [Ammex] operates a United States Customs Class 9 bonded warehouse, also known as a "duty-free sales enter-

prise" or a "duty-free store," *in Detroit, Michigan.* The warehouse is adjacent to the entrance to the Ambassador Bridge, which links the United States and Canada. Although [Ammex's] duty-free store is *within the United States,* it is located beyond the exit point for travelers leaving the United States and *is designated as "sterile" by the United States Customs Service* because it is physically designed to ensure that anyone who enters the store has no alternative but to depart from the United States and enter Canada. Duty-free products purchased at [Ammex's] store are therefore necessarily exported to Canada. *The property on which [Ammex's] facility is located is privately owned.* In addition, all the roads leading from [Ammex's] duty-free store to Canada and the Ambassador Bridge are also privately owned. [*Ammex, Inc v Dep't of Treasury,* 272 Mich App 486, 488; 726 NW2d 755 (2006) (emphases added).]

Thus, a "sterile" designation in no way affects the simple truth that the building and private property on which it sits are physically located in Michigan.

### IV. CONSTITUTIONAL CHALLENGES

#### A. STANDARD OF REVIEW

Ammex raises constitutional challenges to the SBT under three clauses of the United States Constitution: the Supremacy Clause, the Commerce Clause, and the Import-Export Clause. We review de novo constitutional challenges such as these. *Tolksdorf v Griffith,* 464 Mich 1, 5; 626 NW2d 163 (2001).

"A statute is presumed constitutional absent a clear showing to the contrary." *Jefferson Smurfit Corp v Dep't of Treasury,* 248 Mich App 271, 277; 639 NW2d 269 (2001). "The presumption of constitutionality is especially strong with respect to taxing statutes. . . . A taxing statute must be shown to clearly and palpably violate the fundamental law before it will be declared

unconstitutional." *Id.* (Citations, internal quotation marks, and brackets omitted).

## B. THE SUPREMACY CLAUSE

### (1) AMMEX'S ARGUMENT

Ammex argues that its withdrawals of duty-free merchandise from customs bonded warehouses for immediate export to Canada are not constitutionally subject to the SBT because, as applied to Ammex, the tax violates the Supremacy Clause of the United States Constitution.

The Supremacy Clause, US Const, art VI, cl 2, provides Congress with the power to preempt state law. *LaVene v Winnebago Industries*, 266 Mich App 470, 478; 702 NW2d 652 (2005). But "[t]here is a strong presumption against preemption." *Id.* Thus,

> [p]reemption occurs only under certain conditions: (1) when a federal statute contains a clear preemption provision; (2) when there is outright or actual conflict between federal and state law; (3) where compliance with both federal and state law is in effect physically impossible; (4) where there is implicit in federal law a barrier to state regulation; (5) where Congress has legislated comprehensively, thus occupying an entire field of regulation and leaving no room for the states to supplement federal law; or (6) where the state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress. [*Id.*]

### (2) CLEAR PREEMPTION BY FEDERAL STATUTE

Under § 1553 of the federal Tariff Act of 1930, 19 USC 1202 *et seq.*, goods destined for export may be transported through the United States under bond without payment of duties, and then exported.[13] A

---

[13] 19 USC 1553(a) states, in pertinent part, as follows:

customs bonded warehouse is a building or other se-
cured area where goods may be stored duty-free for a
prescribed period. 19 USC 1555. When merchandise is
withdrawn from a bonded warehouse, it may be ex-
ported without payment of federal duties. 19 USC 1557.
In 1988, Congress passed the Omnibus Trade and
Competitiveness Act,[14] which amended 19 USC 1555
and added significantly to the customs bonded ware-
house regulatory scheme. Congress found that "duty-
free sales enterprises play a significant role in attract-
ing international passengers to the United States and
thereby their operations favorably affect our balance of
payments." PL 100-418, § 1908(a)(1), 102 Stat 1315.
Congress also found that "concession fees derived from
the operations of authorized duty-free sales enterprises
constitute an important source of revenue for the State,
local and other governmental authorities that collect
such fees." PL 100-418, § 1908(a)(2), 102 Stat 1315.
Despite the fact that the Omnibus Act bears on the
regulation of customs bonded warehouses and the goods
contained therein, there is no specific preemptive pro-
vision in the federal scheme that would preclude appli-
cation of the SBT to the business activities of a taxpayer
in this state.

(3) STATE LAW AS OBSTACLE TO FULL OBJECTIVES OF CONGRESS

The relevant question here is whether the SBT
stands as an obstacle to the accomplishment of the full

---

Any merchandise . . . shown by the manifest, bill of lading,
shipping receipt, or other document to be destined to a foreign
country, may be entered for transportation in bond through the
United States by a bonded carrier without appraisement or the
payment of duties and exported under such regulations as the
Secretary of the Treasury shall prescribe . . . .

[14] Omnibus Trade and Competitiveness Act of 1988, Pub L No 100-418,
Title I, § 1908(b), 102 Stat 1315, codified at 19 USC 1555(b).

objectives of Congress, which turns on a determination whether Congress intended to promote this business activity.

In *Itel Containers Int'l Corp v Huddleston*, 507 US 60, 69-71; 113 S Ct 1095, 122 L Ed 2d 421 (1993), the United States Supreme Court held that international container conventions that gave favored status to international containers did not preempt a Tennessee sales tax on leases of cargo containers, even though they were for use exclusively in international shipping. In so holding, *Itel Containers Int'l* distinguished international container conventions from the customs bonded warehousing regulatory scheme. *Id.* at 69-70. The Court noted that the federal objective of the bonded warehousing regulatory scheme (i.e., encouraging importers to use American ports) would be frustrated by "state *sales and property* taxes on goods not destined for domestic distribution . . . ." *Id.* at 68, 70 (emphasis added); see *McGoldrick v Gulf Oil Corp*, 309 US 414, 428-429; 60 S Ct 664; 84 L Ed 840 (1940). The Court explained:

> In *McGoldrick* and its progeny, we stated that Congress created a system for bonded warehouses where imports could be stored free of federal customs duties while under the continuous supervision of local customs officials "in order to encourage merchants here and abroad to make use of American ports." *Xerox Corp [v Harris Co*, 459 US 145, 151; 103 S Ct 523; 74 L Ed 2d 323 (1982)]. By allowing importers to defer taxes on imported goods for a period of time and to escape taxes altogether on reexported goods, the bonded warehouse system "enabled the importer, without any threat of financial loss, to place his goods in domestic markets or to return them to foreign commerce and, by this flexibility, encouraged importers to use American facilities." *R. J. Reynolds Tobacco Co [v Durham Co*, 479 US 130, 147; 107 S Ct 499; 93 L Ed 2d 449 (1986)]. This federal objective would be frustrated by the imposition of

state sales and property taxes on goods not destined for domestic distribution, regardless of whether the taxes themselves discriminated against goods based on their destination. *Xerox Corp, supra*, at 150-154. See also *R. J. Reynolds Tobacco Co, supra*, at 144-147; *McGoldrick, supra*, at 428-429. [*Itel Containers Int'l, supra* at 69-70.]

Accordingly, federal regulations of bonded warehouses (i.e., federal duties exemptions) do not preempt *all* state taxes. The SBT is not a state sales or property tax. Rather, it is a tax on Ammex's business activity as a whole. MCL 208.3(2); MCL 208.69(3); *Mobil Oil, supra* at 493. The full objectives of Congress (i.e., "attracting international passengers to the United States," PL 100-418, § 1908[a][1], 102 Stat 1315) may still be achieved. Thus, we conclude that the SBT does not stand as an obstacle to the accomplishment and execution of the full objectives of Congress.

Our conclusion is consistent with an analogous California case, *City of Los Angeles v Marine Wholesale/Warehouse Co, Inc*, 15 Cal App 4th 1834; 19 Cal Rptr 2d 664 (1993).[15] There, the court held that federal regulation of customs bonded warehouses did not preempt a city's *payroll and gross receipts taxes* on operations of an entity operating a customs bonded warehouse that held liquor, tobacco, and soft drinks to be consumed on voyages to foreign countries because the municipal business taxation scheme would not interfere with the policies behind congressional regulation of customs bonded warehouses. *Id.* at 1842. A payroll tax and a gross receipts tax are at least somewhat comparable to the SBT. These taxes are not on goods, and liability is not directly triggered by sales of

---

[15] This Court is not bound by cases from other jurisdictions, although it may find them persuasive. *Mable Cleary Trust v Edward-Marlah Muzyl Trust*, 262 Mich App 485, 494 n 5; 668 NW2d 770 (2004).

goods; rather, the taxes are levied on overall business activity.

This Court recently held that federal law *does* preempt application to Ammex of Michigan's motor fuel tax act, MCL 207.101 *et seq.* (which was repealed by 2000 PA 403), and general sales tax act, MCL 205.51 *et seq. Ammex, Inc, supra,* 272 Mich App at 505. But the analysis in that case is inapplicable here because the SBT, as a value-added tax, is distinct from a direct tax on motor fuel or a general sales tax directly applied to motor fuel.

### (4) REMAINING FACTORS

There is no outright or actual conflict between the SBT and federal law because imposing the SBT does not deprive Ammex of its exemption from federal duties. Further, the SBT does not make compliance with federal law impossible; Ammex can still comply with the rules relating to bonded warehouses. Moreover, there is no barrier to state taxation implicit in the federal law because an exemption from federal duties and taxes does not necessarily imply an exemption from *all* state taxes. *Itel Containers Int'l, supra* at 71. Additionally, although the customs bonded warehouse scheme is comprehensive and pervasive, the United States Supreme Court has held that the bonded warehouse statutes and regulations do not evidence Congress's intent to preempt all state taxation of goods in bonded warehouses by occupying the field of bonded warehouse regulation. *Id.,* citing *R J Reynolds Tobacco Co v Durham Co,* 479 US 130, 149; 107 S Ct 499; 93 L Ed 2d 449 (1986).

On balance, Ammex fails to overcome the "strong presumption against preemption." *LaVene, supra* at 478. The SBT is a tax on business activity in general. Therefore, we conclude that imposition of the SBT on Ammex does not violate the Supremacy Clause.

### C. THE COMMERCE CLAUSE

#### (1) SIX-FACTOR ANALYSIS

Ammex argues that imposition of the SBT on its sales violates the Commerce Clause of the United States Constitution as a tax on foreign commerce. Under the Commerce Clause, Congress has the authority to regulate commerce with foreign nations and among the states. US Const, art I, § 8, cl 3. Six factors apply when a state tax on an instrumentality of foreign commerce is alleged to violate the Commerce Clause:

> [A] state tax will be sustained against a Commerce Clause challenge if it (1) is applied to an activity with a substantial nexus with the taxing state, (2) is fairly apportioned, (3) does not discriminate against interstate commerce, and (4) is fairly related to services provided by the state. Two additional factors must be considered when a state "seeks to tax the instrumentalities of foreign commerce." The first is whether the tax, notwithstanding apportionment, creates a substantial risk of international multiple taxation. The second is whether the tax prevents the federal government from speaking with one voice when regulating commercial relations with foreign governments. [*Ammex, Inc v Dep't of Treasury*, 237 Mich App 455, 466; 603 NW2d 308 (1999) (*Ammex I*) (citations omitted).]

#### (a) SUBSTANTIAL NEXUS WITH TAXING STATE

An activity has a substantial nexus with the taxing state if the subject corporation

> "avails itself of the 'substantial privilege of carrying on business' within the State . . . ." . . . Thus, to allow a state to impose a tax on interstate activities, there must be some minimal connection between those activities and the taxing state. To establish the requisite nexus under the constitution, it must simply be determined whether there exists "some definite link, some minimum connection, between

[the state and the business activities] it seeks to tax."
[*Caterpillar, supra* at 416-417 (internal citations omitted).]

As concluded above, Ammex conducts its business within Michigan. Thus, by having a substantial nexus with Michigan, Ammex satisfies the first prong of the test.

### (b) FAIR APPORTIONMENT

"Fair apportionment requires that each state tax only its fair share of interstate business activity." *Caterpillar, supra* at 417.

> A determination whether apportionment is fair in a given case involves two components. First, the tax structure must be *internally consistent*, which means, a tax must be structured so that if every State were to impose an identical tax, no multiple taxation would result. Second, the apportionment must be *externally consistent*, which [means] the choice of factors used in apportionment reasonably reflects the in-state component of the activity being apportioned. [*Fluor Enterprises, supra* at 728 (internal quotation marks, brackets and citations omitted; emphasis added).]

This Court explained "internal consistency" as follows:

> "Internal consistency is preserved when the imposition of a tax identical to the one in question by every other State would add no burden to interstate commerce that intrastate commerce would not also bear. This test asks nothing about the degree of economic reality reflected by the tax, but simply looks to the structure of the tax at issue to see whether its identical application by every State in the Union would place interstate commerce at a disadvantage as compared with commerce intrastate. A failure of internal consistency shows as a matter of law that a State is attempting to take more than its fair share of taxes from the interstate transaction, since allowing such a tax in one State would place interstate commerce at the mercy of those remaining States that might impose an identical

tax." [*Id.* at 728-729, quoting *Oklahoma Tax Comm v Jefferson Lines, Inc*, 514 US 175, 185; 115 S Ct 1331; 131 L Ed 2d 261 (1995).]

"[I]nternal consistency requires that the formula [be] 'such that, if applied by every jurisdiction, it would result in no more than all of the unitary business's income being taxed.' " *Fluor Enterprises, supra* at 729," quoting *Container Corp of America v Franchise Tax Bd*, 463 US 159, 169; 103 S Ct 2933; 77 L Ed 2d 545 (1983). "Similarly, in the context of the SBT, the component requires that if every state were to impose an identical tax, 'no more than one hundred percent of the taxpayer's business activity would be taxed.' " *Fluor Enterprises, supra* at 729, quoting *Caterpillar, supra* at 419.

Here, Ammex has not shown that if Canada imposed an identical tax, and used an identical apportionment formula, Ammex's business would be taxed more than 100 percent. Michigan is not attempting to take more than its fair share of international transactions, because it is not taxing international transactions; it is taxing the value added by a business incorporated in Michigan and doing business in Michigan.

Ammex cites 19 USC 1555(b)(6)(B), which provides that merchandise purchased in a duty-free sales enterprise by a United States resident who later returns to the United States "shall be considered to be an article acquired abroad as an incident of the journey from which the resident is returning . . . ." The fact that the goods purchased must be *considered* as having been purchased abroad acknowledges that, in fact, they were not purchased abroad. Moreover, we reiterate that the SBT is not a tax on the goods themselves, but on Ammex's business activity in Michigan.

Next, the SBT must be externally consistent, meaning that "the choice of factors used in apportionment reason-

ably reflects the in-state component of the activity being apportioned." *Fluor Enterprises, supra* at 728 (internal quotations omitted). Here, the SBTA requires apportionment in a fair and reasonable manner. For tangible personal property, sales are "in this state" when "the property is shipped or delivered to a purchaser, other than the United States government, within this state regardless of the free on board point or other conditions of the sales," MCL 208.52(a), or when "the property is shipped from a . . . store, warehouse, . . . or other place of storage in this state and the purchaser is the United States government, or the taxpayer is not taxable in the state of the purchaser," MCL 208.52(c). We conclude that these definitions of "in-state activity" reasonably reflect the in-state component of the activity being apportioned.

### (c) DISCRIMINATION AGAINST INTERSTATE COMMERCE

A state tax cannot place interstate commerce at a competitive disadvantage vis-à-vis intrastate commerce. See *Fluor Enterprises, supra* at 730. Thus, a tax violates the third prong of the test "if it is facially discriminatory, has a discriminatory purpose, *or* has the effect of unduly burdening interstate commerce." *Caterpillar, supra* at 422 (emphasis in original).

Here, none of these three modes of discrimination is present. The SBT does not discriminate against businesses engaged in international commerce. As applied to such a business, there is no showing by Ammex that it has a higher SBT liability than a business engaged in domestic commerce. Ammex admits that the SBT falls on domestic, interstate, and foreign commerce alike. Nor does imposition of the SBT discourage or discriminate against purchases of duty-free merchandise given that it is not a direct tax on those goods.

### (d) FAIR RELATION TO STATE SERVICES

The purpose of the fair-relation test " 'is to ensure that a State's tax burden is not placed upon [companies] who do not benefit from services provided by the State.' " *Caterpillar, supra* at 427-428, quoting *Goldberg v Sweet*, 488 US 252, 266-267; 109 S Ct 582; 102 L Ed 2d 607 (1989). The subject tax need not be limited to the cost of the services incurred by the state on account of a particular activity. "[I]nterstate commerce may be required to contribute to the cost of providing *all* governmental services, including those services from which it arguably receives no direct benefit." *Caterpillar, supra* at 428 (internal quotations and citations omitted; emphasis in original). The United States Supreme Court has already opined that the SBT, as a value-added tax, correlates relatively closely to the volume of services provided to a Michigan business, compared to an income tax. *Trinova II, supra* at 364.

Here, Ammex receives the benefits and protections of the government and laws of Michigan. Ammex's customers and employees must use Michigan roads to get to Ammex. Ammex has used the courts of Michigan to address grievances. E.g., *Ammex I, supra*. Ammex benefits from a safer environment fostered by Michigan-based police, prosecutors, laws, and courts. Ammex has used police services to assuage problems originating from competitors. *Commodities Export Co, supra* at 60. In short, Ammex has not shown that the SBT is disproportional to the services, benefits, and protections of Michigan's government and laws.

### (e) SUBSTANTIAL RISK OF INTERNATIONAL MULTIPLE TAXATION

Because the SBT only taxes Ammex's business activity that is apportioned to Michigan, there is no substantial risk of international multiple taxation.

#### (f) ONE VOICE

The sixth factor requires that the tax not prevent the federal government from speaking with one voice when regulating commercial relations with foreign nations. Imposition of the SBT does not violate this prohibition because it is a tax not on the goods exported to Canada, but on Ammex's business as a whole, which is incorporated and located in Michigan.

#### (2) DUE PROCESS CLAUSE

Ammex also argues that imposition of the SBT on its business violates the Due Process Clause. However, Ammex failed to include this claim in its statement of questions presented. Ammex also failed to develop its due process argument or to cite authority. Therefore, we need not consider application of the Due Process Clause in this case. MCR 7.212(C)(5); *Wilson v Taylor*, 457 Mich 232, 243; 577 NW2d 100 (1998); *Caldwell v Chapman*, 240 Mich App 124, 132; 610 NW2d 264 (2000). However, we note that the first and second prongs of the Commerce Clause analysis encompass the minimal-connection and rational-relationship requirements of the Due Process Clause analysis. See *Caterpillar, supra* at 429 n 34. Therefore, in light of our conclusion that the SBT satisfies the Commerce Clause analysis, it necessarily satisfies the requirements of due process.

#### D. IMPORT-EXPORT CLAUSE

Ammex argues that, as applied to sales from its duty-free stores, the SBT amounts to a tax on the goods, or a tax burden on activity so closely connected to those goods as to constitute a tax on the goods, in violation of

the Import-Export Clause of the United States Constitution.

Under the Import-Export Clause, "[n]o State shall, without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports . . . ." US Const, art I, § 10, cl 2. "[T]he primary focus is on the nature of the tax itself (i.e., whether it was an 'impost' or 'duty' within the meaning of the constitution) rather than on the nature of the item taxed (i.e., whether it was an 'import' or 'export' within the meaning of the constitution)." *Ammex I, supra* at 461. A tax is considered an impost or duty if its imposition offends any one of three policy considerations underlying the Import-Export Clause:

> "[1] the Federal Government must speak with one voice when regulating commercial relations with foreign governments, and tariffs, which might affect foreign relations, could not be implemented by the States consistently with that exclusive power; [2] import revenues were to be the major source of revenue of the Federal Government and should not be diverted to the States; and [3] harmony among the States might be disturbed unless seaboard States, with their crucial ports of entry, were prohibited from levying taxes on citizens of other States by taxing goods merely flowing through their ports to the other States not situated as favorably geographically." [*Itel Containers Int'l, supra* at 76, quoting *Michelin Tire Corp v Wages*, 423 US 276, 285-286; 96 S Ct 535; 46 L Ed 2d 496 (1976).]

Both the "one voice" and harmony components of the Import-Export Clause analysis have already been addressed in the Commerce Clause discussion. *Itel Containers Int'l, supra* at 77. Further, the SBT does not divert revenues from the federal government because it is not a tax on importation or on imported

goods but a tax on a business activity occurring within the state.

## V. STATUTORY CHALLENGE

### A. STANDARD OF REVIEW

Having concluded that Michigan may constitutionally impose the SBT on Ammex, we turn to Ammex's contentions regarding application of the statute to its business activities. Under MCR 2.116(C)(10), a party may move for dismissal of a claim on the ground that there is no genuine issue with respect to any material fact and that the moving party is entitled to judgment as a matter of law. The moving party must specifically identify the undisputed factual issues and support its position with documentary evidence. MCR 2.116(G)(3)(b); *Maiden v Rozwood*, 461 Mich 109, 120; 597 NW2d 817 (1999). The court must consider all the documentary evidence in the light most favorable to the nonmoving party. MCR 2.116(G)(4); *Maiden, supra* at 120. We review de novo a lower court ruling on a motion for summary disposition. *Spiek v Dep't of Transportation*, 456 Mich 331, 337; 572 NW2d 201 (1998). The proper interpretation of a statute is a question of law that we also review de novo. *Putkamer v Transamerica Ins Corp of America*, 454 Mich 626, 631; 563 NW2d 683 (1997).

This Court gives effect to the Legislature's intent as expressed in the statute's terms, giving the words of the statute their plain and ordinary meaning. *Willett v Waterford Charter Twp*, 271 Mich App 38, 48; 718 NW2d 386 (2006). Where the language poses no ambiguity, this Court need not look outside the statute, nor construe the statute, but need only enforce the statute as written. *Ayar v Foodland Distributors*, 472 Mich 713,

716; 698 NW2d 875 (2005). This Court does not interpret a statute in a way that renders any statutory language surplusage or nugatory. *Pohutski v City of Allen Park*, 465 Mich 675, 684; 641 NW2d 219 (2002).

### B. APPORTIONMENT

#### (1) THE APPORTIONMENT FORMULA

Ammex argues that if its duty-free sales are subject to the SBT, then it is nevertheless statutorily required to apportion its tax base by excluding export sales, and that there is a genuine issue of material fact regarding whether and how Ammex is required to apportion its tax base for SBT purposes. According to Ammex, it is subject to tax in Canada or, at the very least, Canada has jurisdiction to tax Ammex; thus, Ammex is required to apportion its tax base under the SBT.

"Once the taxpayer's tax base is determined, it must then be allocated to the state where the business activity of the taxpayer can be fairly attributed. As a general principle, a State may not tax value earned outside its borders." *Fluor Enterprises, supra* at 716-717 (internal quotations and citations omitted). Thus, "if a business conducts its business activity exclusively in Michigan, its entire . . . tax base would be allocated to Michigan and subject to taxation under the act." *Trinova I, supra* at 151; see MCL 208.40. However, where only a portion of the business's activity is attributable to Michigan—that is, where the taxpayer's "business activities are taxable both within and without this state," MCL 208.41—the tax base must be apportioned between Michigan and other states in which the taxpayer conducts business activities. *Caterpillar, supra* at 409; see also MCL 208.40 and 208.45; *Trinova I, supra* at 151. "Apportionment is permissible because

precise geographic measurement of value added is not feasible." *Fluor Enterprises, supra* at 717.

(2) THE SALES FACTOR

As mentioned, the SBTA provides a three-factor formula for apportioning a taxpayer's tax base between two or more jurisdictions whereby the total tax base is multiplied by the portion of business activity attributable to Michigan. *Fluor Enterprises, supra* at 717; *Caterpillar, supra* at 409. The portion of its total value added attributable to Michigan is the average of three ratios: "(1) Michigan payroll to total payroll, (2) Michigan property to total property, and (3) Michigan sales to total sales." *Trinova II, supra* at 367-368, citing MCL 208.45, 208.46, 208.49, and 208.51. The controversy here concerns the sales factor of the SBT apportionment calculation. The SBTA defines the sales factor as "a fraction, the numerator of which is the total sales of the taxpayer in this state during the tax year, and the denominator of which is the total sales of the taxpayer everywhere during the tax year." MCL 208.51(1).

MCL 208.69(3) provides: "The apportionment provisions of this act shall fairly represent the business activity attributed to the taxpayer in this state, taken as a whole . . . ." For tangible personal property, sales are "in this state" when "the property is shipped or delivered to a purchaser, other than the United States government, within this state," MCL 208.52(a). As concluded earlier, Ammex's operations occur "within this state." Ammex is a Michigan corporation conducting a commercial operation on private land located in Michigan, whereby it sells, or "delivers," merchandise, or "tangible personal property," to its purchasers "in this state." See also MCL 208.3(2) (defining business activity as the transfer of title to tangible personal

property "made or engaged in, within this state, whether in intrastate, interstate, or foreign commerce, with the object of gain, benefit, or advantage, whether direct or indirect, to the taxpayer or to others . . . ."). Thus, we conclude that Ammex conducts business activities within this state such that it is subject to the SBT.

### (3) "EXPORT SALES"

Ammex nevertheless argues that its sales are not Michigan sales by arguing that they should be classified as "export sales." We disagree. Ammex is not itself an exporter—its *customers* export the goods purchased.

> The definition of "duty-free sales enterprise" demonstrates that Ammex is not an exporter. Congress has defined a "duty-free sales enterprise" to mean "a person that sells, for use outside the customs territory, duty-free merchandise that is delivered from a bonded warehouse to an airport or other exit point for exportation by, or on behalf of, individuals departing the customs territory." 19 U.S.C. § 1555(b)(8)(D); see also 19 C.F.R. § 19.35(a). ("A class 9 warehouse (duty-free store) may be established for exportation of conditionally duty-free merchandise by individuals . . . .").
>
> According to the definition, a duty-free store does not itself export, but rather sells duty-free goods for export *by someone else* (i.e., a customer). [*Ammex, Inc v Internal Revenue Service*, 367 F3d 530, 536 (CA 6, 2004).]

Thus, Ammex is simply "a retailer that facilitate[s] exportation by the individual retail customers who depart[] the country." *Id.*

### (4) "DOCK SALES"

Ammex also relies on Letter Ruling (LR) 1988-107 for the proposition that its duty-free sales constitute

"dock sales" and are, therefore, excludable from the numerator of its sales factor. However, this reliance is misplaced. A "Letter Ruling is not binding on either the Department or taxpayers." Revenue Administrative Bulletin (RAB) 2000-6. More importantly, a letter ruling is not binding on this Court. See *Electronic Data Systems Corp v Flint Twp*, 253 Mich App 538, 544; 656 NW2d 215 (2002) (the Court of Appeals is not bound by decisions of the Tax Tribunal). Further, LR 1988-107 is factually distinguishable. That ruling addressed a situation in which the customers of a Michigan taxpayer would pick up wholesale goods in Indiana and immediately transport them to Michigan for resale. This is described as a "dock" or "pick-up" sale because the seller does not ship the goods. The letter ruling concludes that "[e]ven though the purchaser took legal title and delivery of the goods in Indiana, the immediate 'pick-up' and transportation of the merchandise to Michigan will cause the sale to be included in the Michigan sales factor." However, Ammex's customers do not take legal title and delivery of the goods in another state to transport the merchandise to Michigan. And, contrary to Ammex's assertion, the ruling cannot be applied conversely to conclude that the sales are Canadian sales because, although goods sold at Ammex's facilities are immediately transported to Canada, Ammex is not a Canadian corporation—in other words, the customer is not simply "picking up" a good that, if shipped by the seller, would be considered a Canadian sale.

### (5) TAXABLE IN CANADA

#### (a) THE LANGUAGE OF THE STATUTE

Having concluded that Ammex is subject to taxation under the SBTA, the relevant question becomes whether Ammex's sales have to be apportioned, as

Ammex asserts, on the ground that its business activities are also taxable in Canada.

> [A] taxpayer is taxable *in another state* if, (a) in that state he is subject to a business privilege tax, a net income tax, a franchise tax measured by net income, a franchise tax for the privilege of doing business or a corporate stock tax, a tax of the type imposed under this act, or (b) that state has jurisdiction to subject the taxpayer to 1 or more of the taxes regardless of whether, in fact, the state does or does not. [MCL 208.42 (emphasis added).]

A "state" includes "any foreign country, or political subdivision . . . ." MCL 208.7(2).

We first note that by focusing on whether Ammex is subject to "actual SBT liability" in another state, the Court of Claims erred in its interpretation of MCL 208.42 in two respects. First, MCL 208.42 provides for apportionment when another state imposes, or has jurisdiction to impose, one of several taxes on the subject business, *not just an SBT-like tax*. Thus, the Court of Claims employed an overly narrow reading of MCL 208.42 by only considering whether Ammex was subject to an SBT-like tax in Canada. And second, under MCL 208.42, an SBT taxpayer is permitted to apportion its tax base if another "state *has jurisdiction* to subject the taxpayer to 1 or more of the taxes [enumerated] *regardless of whether, in fact, the state does or does not.*" MCL 208.42 (emphasis added). Thus, the Court of Claims erred in considering only whether Ammex was *actually subject* to Canadian tax. Having clarified the language of the statute, we now turn to whether Ammex is considered "taxable . . . without this state."

(b) MCL 208.42(a)—ACTUAL IMPOSITION OF CANADIAN TAX

Under MCL 208.42(a), Ammex would be considered "taxable in another state" if Canada actually

imposed—as opposed to merely having jurisdiction to impose—one of the several taxes enumerated in that provision. Ammex submitted evidence below showing that AME was required to withhold 15 percent of the management fee paid to Ammex for services rendered by a nonresident of Canada. But the Court of Claims properly rejected this evidence because the withholding obligation is AME's, and not Ammex's. Ammex also argues that the hearing referee, in an informal conference recommendation, found that Ammex established that it is subject to Canadian tax and has supported its right to apportion sales. However, this Court is not bound by that recommendation. See *Electronic Data Systems, supra* at 544. Further, as discussed below, to support its arguments raised before the Court of Claims, Ammex submitted an affidavit of Dannie Stamper, President of DIBC. That affidavit, however, does not allege that Canada actually imposed any type of tax on Ammex. Accordingly, Ammex has not submitted any relevant evidence to demonstrate that its business activities are *actually subject* to any type of tax liability specifically enumerated under MCL 208.42(a) to survive a motion for summary disposition.

### (c) MCL 208.42(b)—CANADA'S JURISDICTION TO TAX

Nevertheless, Ammex argues that the Department of Treasury's RAB 1998-1 establishes that there is a question of fact regarding whether Canada has the *jurisdiction* to tax its business activities. See MCL 208.42(b). RAB 1998-1 provides "the jurisdictional standard to determine whether a taxpayer is . . . subject to tax in another state for purposes of apportionment under the [SBT]," and states, in pertinent part, that another state has jurisdiction to tax a Michigan taxpayer where the taxpayer "regularly and systematically

conducts . . . business activity through its employees, agents, representatives, independent contractors, brokers or others acting on its behalf, whether or not these individuals or organizations reside in" that state for at least ten days on an annual basis. RAB 1998-1(II) and (I)(6)(a). Regular and systematic business activity may exist if less than ten days of business activity occurs in the state on an annual basis. RAB 1998-1(I)(6)(b).

In support of its claim that its employees regularly and systematically perform services in Canada, Ammex submitted to the Court of Claims an affidavit of Dannie Stamper, President of DIBC, attesting that "[d]uring the 1993, 1994 and 1995 years, Ammex's employees regularly and systematically conducted business operations in Canada, including but not limited to providing accounting and financial services, for more than 10 days during each of the years at issue." This statement apparently refers to the financial services that Ammex provides to AME.

Under MCL 208.53,

Sales, other than sales of tangible personal property,[16] are in this state if:

* * *

(b) The business activity is performed both in and outside this state and, based on costs of performance, a *greater proportion* of the business activity is performed in this state than is performed outside this state. [Emphasis added.]

Thus, if the greater proportion of the business activity is performed *inside* Michigan, then, for SBTA purposes, that business activity pertaining to intangible sales is deemed to occur exclusively "in this state." The con-

---

[16] Under the SBTA, the term "sales" includes "[t]he performance of services." MCL 208.7(1)(a)(*ii*).

verse of the provision is that if a greater proportion of the business activity is performed outside this state, then the business activity is deemed to occur *outside* this state.

The Stamper affidavit is the only piece of evidence Ammex submitted to support this claim. We acknowledge that when a party moves for summary disposition on the ground that there is no genuine issue of material fact, *all* documentary evidence, including affidavits, is relevant and must be viewed in the light most favorable to the nonmoving party. MCR 2.116(G)(4); *Maiden, supra* at 120; *Madison Nat'l Bank v Lipin,* 57 Mich App 706, 709-710; 226 NW2d 834 (1975). But we do not agree with Ammex that there remains a question of fact regarding whether apportionment is necessary to account for its intangible "sales" in Canada. The record below reveals that of the approximately $150,000 in fees AME paid each year to Ammex, only $15,000 arises from work done in Canada. Thus, there is no genuine issue of material fact that the *greater proportion* of Ammex's financial services was not performed in Canada. See MCL 208.53(b). Therefore, Ammex's business activity pertaining to intangible sales is deemed to occur exclusively in Michigan.

Accordingly, we conclude that Ammex is not entitled to apportion *any* of its sales under the sales factor of the apportionment formula because all of its sales, both tangible and intangible, are Michigan sales for purposes of imposing the SBT. See *Trinova I, supra* at 151 ("if a business conducts its business activity exclusively in Michigan, its entire . . . tax base would be allocated to Michigan and subject to taxation under the act"); see also MCL 208.40.

## VI. CONCLUSION

The SBT does not violate the Supremacy Clause, the Commerce Clause, or the Import-Export Clause. There

is no question of fact that Ammex's primary business activity—tangible sales of duty-free merchandise[17]—occurs within this state and is taxable under the SBTA. Moreover, Ammex is not entitled to apportion its intangible sales under the sales factor of the apportionment formula because its services performed in Canada do not constitute a greater proportion of its business activity. Accordingly, the Court of Claims properly granted summary disposition to the Department of Treasury.

We affirm.

---

[17] Ammex admits that "[t]he vast majority of [its] sales are of tangible personal property, not services."